Per Curiam :
Plaintiff, while employed as a civilian at the United States Army Procurement Center, Frankfurt, Germany, was charged with the offense of “altering and using an official document to defraud the United States” and was subsequently removed from his position as comptroller, GS-12, Step 3, in 1965. Plaintiff, who appears pro se, sues for *570 back pay and reinstatement from April 1965. Defendant urges that there is no merit to plaintiff’s claim, and that suit not having been filed until December 8, 1970, in any event the claim is barred by the doctrine of laches.
Defendant’s motion for summary judgment was denied by order dated April 27, 1973. The case was remanded to the trial judge for appropriate proceedings toward resolution of disputed factual issues, “in particular those relating to any possible ex parte evidence, any factors pertaining to plaintiff which might affect the application of the doctrine of laches to the case, and others.”
After a trial, Trial Judge Miller concluded that (a) under the pertinent military regulations plaintiff had been wrongfully deprived of his pay from April 13, 1965 to August 30, 1965 (i.e. from the original date of his removal to the completion of his appeal to the major command in Europe); (b) the penalty of removal was, in all the circumstances, an abuse of discretion and too harsh; (c) the appropriate penalty would be no more than suspension without pay for a period of approximately two years and six months (from June 8, 1968 to December 8,1970); (d) the bar of laches should not preclude the entire suit but only foreclose recovery for the same period (June 8,1968 to December 8,1970) ; (e) plaintiff is entitled to be restored to his former position (or to an equivalent position in Grade GS-12); and (f) plaintiff is entitled to back pay from April 13,1965 (his initial removal date) to the date of his restoration to duty, with the exception of the two and one-half year period from June 8, 1968 to December 8, 1970.
We agree with the first of these holdings but disagree with the second and the third. Our determination, contrary to that of the trial judge, is that removal was not an abuse of discretion. This conclusion disposes of the demand for restoration and the bulk of the claim for back pay, and makes it unnecessary for us to consider the defense of laches as it applies to that major portion of the back-pay claim which we deny on the merits.
In Parts I and II of this opinion we adopt the trial judge’s statement of the facts and his discussion of the minor back-pay claim for the period from April 13,1965, to August 30, *571 1965. In Part III we set forth our own evaluation of the severity of the penalty, in the light of all the circumstances, and of the argument that the Army abused its discretion in separating plaintiff. Next, in Part IV, we adopt and supplement the trial judge’s discussion of the alleged procedural errors with respect to ex parte presentations. Part V concludes with our own short analysis of why laches does not bar the lesser pay-claim for April-August 1965.[1]
I
It was the responsibility of the Procurement Center’s comptroller’s office, which plaintiff headed, to maintain its financial records. All requests for payment of obligations, totaling some $400 million annually, had to be certified by the comptroller’s office. Plaintiff supervised some 40 clerks whose function it was to match requests with supporting documents and balances of funds on account, certify that the obligations could be paid, and then record the expenditures. The comptroller’s office itself kept no cash and could only certify for payment requests accompanied by the appropriate documents, e.g., contract, travel order, delivery receipt, none of which were within the purview of the comptroller’s office.
Plaintiff, who had an aggregate of more than 23 years of satisfactory Federal service, began his service in the Procurement Center in 1958 as an accountant, GrS-10. Throughout his employment there to 1965 plaintiff received consistently high performance ratings, and was rapidly promoted. In 1963 he became comptroller, GS-12. He earned a reputation for outstanding technical competence and proficient, innovative work. Twice, in 1960 and 1962, he received sustained superior performance awards. On December 28, 1964, just a few days prior to the incident causing his removal, plaintiff for the second straight year was recommended by his superiors for promotion to a GS-13 grade.
The facts surrounding the incident leading to the removal action are mostly not in dispute. Civilian employees of the Department of the Army hired in the United States and *572 stationed in Germany were entitled and encouraged to take biennial home leave at Government expense. The travel authorization for plaintiff and his wife for purposes of such leave was dated December 18, 1964. It authorized their travel outside the United States by Government air, rail and water transportation, or by his own vehicle, and within the United States by first-class air, air tourist (if available) and rail transportation or by his own vehicle. It also listed their port of embarkation to be Bremerhaven, their date to report there, January 5, 1965, and the name of the vessel on which he was 'booked, SS United States. After a month’s vacation in Beverly Hills, California, on February 8, 1965, plaintiff was scheduled to proceed to Bock Island, Illinois, to attend a 2-week Army seminar on top management and on February 24, 1965, to be available for return travel. The travel authority made no arrangements for return booking.
Travel accommodations for Department of Defense personnel were handled by the Military Sea Transportation Service (MSTS). The names, status, and family compositions of those scheduled to travel were supplied by the sponsoring agency and they were then assigned accommodations by the MSTS on the basis of rank or GS level. There was no fixed cutoff between those entitled to first-class and those entitled to cabin-class accommodations, either in any regulation or in actual practice. It depended on the blocks of space procured by MSTS for a particular voyage and the actual mix of the authorized travelers. On one sailing all GS-13’s or equivalent might be in cabin class, on another the GS-12’s might be in first class. An effort was made, however, to avoid aggravated invidious treatment by placing all those in the same 'grade in similar accommodations. On the January 5, 1965 voyage of SS United States GS-13’s were placed in first class, GS-12’s and below in cabin class. Plaintiff, who had been listed with the MSTS as a GS-12, was therefore assigned cabin accommodations.
After the ship departed Bremerhaven, plaintiff presented to the assistant purser of the ship additional copies of his travel orders, which he had previously altered so as to indicate falsely that his grade was a GS-13, and sought reassignment to first-class accommodations. At Southampton the *573 purser called tlie “mistake” to the attention of the MSTS representative and the latter obtained first-class accommodations for plaintiff and his wife at an additional cost to the Government of $351.
Shortly thereafter, Col. John T. McKee, Commanding Officer of the Army Procurement Center, received a complaint from the Army Transportation Command that the Procurement Center had furnished erroneous travel orders designating plaintiff at a level inferior to his actual rank. At Colonel McKee’s direction an investigation was conducted by the Criminal Investigation Detachment (CID). The CID eventually located and interviewed plaintiff at his hotel in California, and he admitted the alteration and misuse of the altered travel order. Colonel McKee ordered plaintiff to return to Frankfurt at the end of his leave without attending the seminar, and plaintiff departed from New York on February 8,1965.
Colonel McKee retired from the Army on March 1,1965. Based on the information received by that time, Colonel McKee had decided to proceed with action to remove plaintiff from the Service. Prior to his departure he discussed this fully with his successor, Col. George E. Larsen. On March 2, 1965, Colonel Larsen sent plaintiff an “Advance Notice of Proposed Removal,” effective April 5, 1965, charging him—
with altering and using an official document to defraud the United States Government * * * [by] changing] the grade and salary from GS-12, $10,960 to GS-13, $12,075 on a copy of [his] travel orders * * * [by presenting it to] an assistant purser on the S.S. United States * * * for fraudulent purposes * * * to change [his] accommodations [to those] based on the grade GS-1‘3 indicated thereon. * * *
As authorized by the notice, at plaintiff’s request, an informal meeting was held with Colonel Larsen on March 10, 1965, for presentation of plaintiff’s side of the case. Also present were plaintiff’s attorney and Maj. Eugene Murphy, Colonel Larsen’s Procurement Judge Advocate. Plaintiff admitted the alteration but claimed in mitigation his actions had been motivated by his depression over the fact that his position was deserving of a higher grade (to which he had been twice recommended) and by the fact that many of his *574 friends mistakenly thought he held a higher grade. Thus he decided to maintain that posture in their eyes. He claimed he had no intention to defraud the United 'States, but had presented the altered orders to the purser in a moment of foolishness and “poor judgment,” and under the influence of medically prescribed tranquilizing drugs. Plaintiff stated that he was “yery, very sorry” and that he wanted to reimburse the Government for the cost involved, which he subsequently did. Plaintiff also detailed his long, distinguished and theretofore unblemished, record in the military and civil service and pleaded that he could continue to render competent and trustworthy service. The formal written reply to the proposed removal submitted by plaintiff on April 2, 1965, embodied these same represenations.
On April 7, 1965, Colonel Larsen advised plaintiff of his removal on the ground that there was substantial evidence to support the charges of—
altering and using an official document to defraud the US Government * * *. In view of your military service in the Finance Corps, including approximately seven years as a Lieutenant, your approximately two years as a Supervisory Accountant with the US Army Audit Agency, and over six years with the U'S Army Procurement Center Frankfurt as an Accounting Officer, Supervisory Accountant, and Comptroller, you were especially well qualified to be aware of the gravity and implications of your actions. * * *
As entitled by Department of the Army Civilian Personnel Regulations, plaintiff appealed his removal to the major commander, the Commander in Chief, United States Army, Europe (CINC USAREUR). Incident to such an appeal plaintiff was entitled to an evidentiary adversary type hearing before a grievance examiner, who was to make findings and conclusions for submission to the Commander in Chief. This was held on May 24,1965.
At the administrative hearing Colonel Larsen justified his ouster of the plaintiff on the ground that Mr. Rifkin’s position required him to sign documents authorizing the outlay of huge amounts of Federal funds, and that such authority required a man whose trustworthiness and absolute honesty in all matters is beyond all doubt in the minds of both his *575 superiors and subordinates, whereas plaintiff’s conduct had permanently impaired that trust. The grievance examiner found that there was no question as to the objective facts of plaintiff’s conduct, but that the maximum penalty, which under the regulations could have ranged from a 5-day suspension to removal from the Federal Service, was too severe for the offense.
•She was of the view that inadequate consideration had been given to plaintiff’s prior record of more than 20 years of exemplary Federal, military and civilian, service and that his one fall from grace was not in the course of his regular duties and did not show that he had or would betray a trust involved in such duties. With respect to the commanding officer’s finding that Eifkin had intended to defraud the Government, she found more persuasive the statements of two of his co-workers that his misdeed was the product of personality traits which placed undue emphasis upon recognition of his prestige and importance, rather than any intent to defraud. Moreover, she found that “there is no regulation which states that Mr. Eifkin was not, even as a GS 12, precluded from first class accomodations [sic]”, and that there was a question whether the Government had suffered any loss and whether the loss would not have been considered an acceptable condition on another sailing date.
The grievance examiner concluded that the penalty of removal was too severe under the circumstances of this case because (1) while plaintiff did use an official document to defraud the Government, there was no evidence that at the time of alteration he intended to so defraud; (2) he had a long career of faithful and outstanding service; and (3) he could still render trustworthy and effective service in another position. Accordingly the examiner recommended that plaintiff be transferred to another organization at a different location, suspended with loss of pay for up to' 6 months, reduced to a lower grade and position in which he would have no responsibility for disbursing funds and/or changed to a nonsupervisory position.
As allowed in the Department of the Army Civilian Personnel Eegulations, the Commander in Chief, Europe, referred the recommendations of the grievance examiner to an *576 Employee Appeals Review Board, at Ms headquarters, consisting in this instance of two army officers and one civilian employee. In July 1965, the board found that “the charge of altering and using an official document to defraud the United States Government is supported,” that no relief should he granted due to the seriousness of the act and the comparative possible sentences if found guilty in a civilian or military court, and that accordingly Mr. Rifkin’s appeal should be denied and Ms removal from the Federal Service be finalized for the good of the Federal Service.
On August 30, 1965, the Commander in Chief, Europe notified plaintiff that the appeal record “clearly supports the charge that you did alter and use an official document to defraud the United States Government” and that his removal would promote the efficiency of the Federal Service. Therefore, he would not set aside or modify Colonel Larsen’s decision. He also advised plaintiff of his right to seek review by either the Secretary of the Army or the Civil Service Commission, but not by both. (Civilian Personnel Regulation S1.2-6«.(2) (a) (i) (Change 6, Feb 6,1964).)
Plaintiff elected to appeal to the Secretary of the Army. In addition to challenging the penalty of removal as grossly excessive and not warranted, plaintiff raised the issue of discriminatory treatment of civilian personnel vis-á-vis military personnel by comparing his situation to that of a military officer with the Procurement Agency who had received substantially lighter punishment for an allegedly similar offense. After consideration of further information about this incident supplied by Headquarters, United States Army, Europe (USAREUR), at the Secretary’s request, the Employment Policy and Grievance Review Board stated that “the charge of altering and using an official document to defraud the United States Government was supported by substantial evidence and warrants the action taken.” The board had also directed an inquiry to Headquarters, USAREUR, regarding the severity of the penalty. The board noted its agreement with Headquarters, USA REUR’s response to the effect that a person who had plaintiff’s responsibilities for certification and financial management of procurement funds must exemplify the *577 highest standards of personal integrity and “ ‘Mr. Rifkin’s deliberate action to defraud the United States necessitated his removal’ On April 27,1966, the Secretary of the Army sustained the removal as “appropriate in light of the nature of your offenses and your position of trust” and not an abuse of administrative discretion.
On June 3,1966, the president of the American Federation of Government Employees wrote to the director of Civilian Personnel of the Army concerning the possible use of ex parte evidence in plaintiff’s case. On July 28, 1966, the department supplied plaintiff copies of three documents so used: the letter dated July 2, 1965, from the Commanding General, Communications Zone Europe, to Commander in Chief, United States Army, Europe; the memorandum to the Deputy Chief of Staff at CINC USAREUR from the Appeals Review Board, dated July 27,1965, setting forth its recommendations; and the comments on plaintiff’s appellate brief that were furnished the Secretary of the Army by the Commander in Chief, United States Army, Europe, on March 2,1966. Plaintiff’s attorney was advised that he could submit any comments on the documents, and, under date of August 22,1966, he did so. His comments were forwarded to the Office of the Under Secretary, Department of the Army, for consideration. Such submission together with the documents were considered by the Army, and in a supplemental report the Employment Policy and Grievance Review Board found no facts warranting modification of its original decision. On November 25,1966, the Deputy Under Secretary of the Army advised plaintiff that it had been determined that there was no reason for modifying the department’s decision of April 27, 1966.
On June 2, 1966, plaintiff appealed to the Civil Service Commission. On June 29,1966, the Appeals Examining Office disallowed the appeal on grounds that plaintiff had exhausted his appellate rights by filing an appeal with the Secretary of the Army. Plaintiff’s appeal of this decision to the Commission’s Board of Appeals and Review was also denied on September 8,1966. Meanwhile during 1966, plaintiff’s wife wrote to the President of the United States complaining that her husband had been victim of religious discrimination. The matter was referred to the Equal Employment Opportunity *578 Officer of the Army who determined that the appeal had not been filed within the statutory period and therefore could not be considered. This decision was then appealed by plaintiff to the Civil Service Commission which sustained the Army’s decision, most recently on April 13, 1967. Plaintiff’s further efforts in 1969 to have the Army change Standard Form 50 issued him at the time of his removal, which stated “Employee altered and used an official document to defraud the United States Government,” to omit any reference to the word fraud, were also fruitless. Suit was filed in this court on December 8,1970.
Following his removal, plaintiff continued to reside in Germany. Eventually, in 1970, he obtained a job in the United States Army Commissary as a sales clerk, GS-3, Step 1, at an annual salary of $5,212. By August 1974 he had been promoted to supervisory supply clerk, GS-5, Step 10, earning $10,467.
II
Plaintiff claims that regardless of the correctness of his discharge he was wrongfully deprived of his pay for the period from April 13,1965 (the initial date of the determination to remove him) to August 30, 1965 (when the major command confirmed his removal). The essence of Ms claim is that by regulation an oversea employee of the Army, recruited in the United States, is entitled to remain in duty status until the completion of his appeal to the major command.
The Civilian Personnel Kegulations provide in pertinent part (CPRE2.5 (June 1962)) :
SPECIAL PROVISIONS FOE OVERSEA EMPLOYEES
5-8. In processing an action under CPR SI discharging for cause a United States citizen employee serving overseas who is eligible for return transportation at Government expense, or, who is ineligible for such transportation but who cannot remain in the oversea area after separation because of immigration requirements and/or agreements requiring repatriation to the country of residence, the special provisions set forth below will be applicable. These provisions do not apply to separa *579 tion of an individual serving a probationary or trial period.
‡ ‡ ‡ $
o. If the employee files an appeal and requests authority to remain in the command, the installation will extend the notice period and inform the employee that he will be retained at the installation in a duty status pending the hearing and final disposition of the appeal at the major command level. Should the reasons for the removal action preclude retaining him on duty, he will be retained at the installation but suspended without pay. The suspension must be processed under CPR. SI as a separate personnel action. The employee may also be permitted to remain at the installation in annual leave or leave without pay status provided the submission of a written request for such leave is a completely voluntary action on the part of the employee. Enforced annual leave will not be directed by the installation for the purpose of removing the employee from a duty status. [Emphasis in original.]
It is clear from the record that plaintiff’s waiver of duty status was not “a completely voluntary action” within the meaning of the regulation and plaintiff did not waive duty status pending resolution of his appeal. Prior to the April 9, 1965 meeting with plaintiff, Colonel Larsen had been instructed by his judge advocate, Major Murphy, and the civilian personnel officer, Mr. Rowe, that plaintiff was likely to request to remain in duty status pending his appeal, but that plaintiff did not qualify under the regulation. Their rationale was that plaintiff, having just used his entitlement to travel at Government expense by means of a round trip to the United States and not yet having completed a new tour of duty, was not “eligible for return transportation at Government expense” and therefore not within the scope of the Special Provisions.[2] At the meeting plaintiff indicated that he did intend to request duty status and that the letter of appeal he had prepared so indicated. Colonel Larsen told plaintiff that the letter was unacceptable and instructed plaintiff to redraft the letter requesting annual leave or leave without pay. Despite their objections, plaintiff and his counsel submitted a revised letter on April 9, 1965, which com *580 plied with that direction. By letter of April 12,1965, Colonel Larsen amended his original decision to permit plaintiff to utilize his annual leave and then continue in leave without pay status. The decision stated:
3. * * * However, in order to minimize personal hardship to you and your family during the period of appeal, paragraph 1, reference lc is amended to delete 12 April 1965 as the effective date of your removal. I find no justifiable basis for continuing you in a duty status pending the receipt of a decision on your appeal. I do approve your request for annual leave and leave without pay during this period beginning at 0730, 13 April 1965. * * *
This enabled plaintiff to retain commissary, post exchange and other similar pi’ivileges through September 17,1965.
Defendant’s position is that plaintiff is not entitled to the benefit of the Special Provisions for Oversea Employees because, having just taken advantage of his biennial reemployment leave and round-trip transportation to the United States, under the Civilian Travel Regulations he became obligated to serve an additional 2 years before becoming “eligible for return transportation at Government expense” within the meaning of the special provision.
The Civilian Travel Regulations, CPR T3, (June 1961) provide (para. 1-6) that each new or current employee selected for assignment to an oversea official duty station is required to sign a transportation agreement prescribing a stipulated period of oversea duty before transportation at Government expense to the oversea area may be authorized and that he has a vested right to return transportation only upon completion of the prescribed period of service (here 2 years). The standard transportation agreement, which is attached to the regulations, provides for round-trip transportation of such employees, their immediate families, their household goods and personal effects at Government expense, but employees are not eligible for the return portion if they separate voluntarily or are separated involuntarily because of misconduct prior to completion of the agreed period. Paragraph 2-11 of the regulations allows and encourages employees, upon completion of the minimum period of service and execution of an agreement for a new tour of duty, to *581 utilize this transportation for “reemployment leave” in the United States. The prescribed tour for the new transportation agreement then begins as of the date the employee returns to work. (Para. 2-11 .a.)
The travel regulations set forth qualifications for return “transportation entitlement” from an oversea duty station to place of residence. (CPE T3.2-4.C. (June 1961).) In addition to completion of the agreed minimum period of service, these include the requirements that the employee has been reassigned or transferred from, or recruited in the United States; or, if he is a United States citizen hired locally, that he maintain bona fide residence in the United States. For purposes of such entitlement an individual is considered to have prima facie residence in the United States if his status at the time of employment was that of student formally enrolled in a recognized institution of learning, traveler absent from the United States for not more than 6 months, member of the Armed Forces separated locally for the express purpose of accepting Federal employment, or employee of another Federal agency, instrumentality, Government contractor, international organization, or other activity operating in support of the United States or its personnel, if the individual was recruited in the United States under conditions of employment which provided for return transportation.
It is apparent that even for purposes of the travel regulations the meaning of a term such as “eligible for return transportation at Government expense” would depend upon the context in which the phrase appeared. For example, paragraph 1-6 provides that upon completion of the prescribed period of service the otherwise qualified employee has a “vested right” to return transportation at Government expense. The implication is that completion of the minimum period of service results in “vesting” and that prior to that time one is eligible if he eventually meets the other conditions for return transportation at Government expense. Similarly, paragraph 2-4.e. provides that to avoid misunderstanding and disagreement at a later date as to meeting the conditions, “entitlement to retwm transportation will be determined at time of appointment and recorded through execution of [the'] tramportation agreement" (emphasis in original). It is obvious that in such context “entitlement” *582 means qualified other than by completion of the service period. “Eligible” would certainly appear to mean less than “vested” or “entitled”.
It is concluded that in the contest of the Grievance and Appeal Procedures (CPS E2) Special Provisions for Oversea Employees (section 5-8), the provision for allowing employees “eligible for return transportation” who are appealing removal actions to remain in duty status pending-disposition of their appeals is not limited to the time after they have completed their periods of service.
It is important to note that the special provision covers not only employees eligible for return transportation but two other groups, to wit:
[A] United States citizen employee serving overseas who is eligible for return transportation at Government expense, or, who is ineligible for such transportation but who cannot remain in the oversea area after separation because of immigration requirements and/or agreements requiring repatriation to the country of residence * * *.
The regulations contain no explanation as to the reason why the three categories of employees are to be retained in duty status pending appeal of their discharge for cause, or as to what common purpose is served by similar treatment for those eligible for return transportation, those who camiot remain in the area because of immigration restrictions, and those who must be repatriated. Nor does defendant suggest any common denominator. Absent any other interpretative aid, it is inferred that the purpose of the Special Provisions for Oversea Employees is to insure that a United States citizen who would be unlikely to be able to find foreign employment because of cultural or legal impediments will not be effectively deterred or hampered in the exercise of his light to appeal his discharge to the major command level by his inability to support himself in the foreign area while, the appeal is pending.
In the context of the Grievance and Appeal Procedure a “citizen employee * * * who is eligible for return transportation at Government expense” is one who is a resident of or is reassigned or transferred from or recruited in the United States, or if hired locally maintains bona fide residence in the United States and has not been absent for 'more *583 than 6 months, or was a student or member of the Armed Forces or employee of another Federal or similar agency who transferred for the purposes of obtaining the particular employment, i.e., all those covered by a transportation agreement, whether or not the right to the return portion has matured. A regulation that an employee who meets the above requirements is not eligible to remain in duty status pending the appeal from his removal because he does not have 2 years of service since his last home leave, while at the same time one who does not meet such requirements but is barred from remaining in the area by immigration restrictions or international repatriation agreement is entitled to duty status after only one day’s employment would create a discrimination without discernible purpose. Under defendant’s construction, the only persons who would ever be “eligible for return transportation,” and therefore entitled to remain in duty status, would be those who had completed their minimum service but had not yet exercised their right to reemployment leave. This would mean that an employee could come within the protection of the special provisions only once every 2 years, and then remain eligible for this protection for probably only a few months at most. Such an anomalous construction would appear to defeat the purpose of the special provisions.
A second factor that makes the Government’s interpretation untenable is that the same prerequisite, i.e., “eligible for return transportation at Government expense,” applies to retention in leave status, which Colonel Larsen granted without hesitation. If plaintiff was not within the class of persons to whom the special provisions applied, then obviously he could not be afforded my of the protections or rights created therein. The introduction to the special provisions identifies those employees for whom a discharge action must be processed in accordance with the special procedures. Paragraph c begins by providing that an employee requesting to remain in the command “will be retained at the installation in a duty status pending the hearing and final disposition of the appeal at the major command level”. If it is inappropriate to keep Mm in duty status, a separate suspension action must be processed with appropriate notice and hearing procedures. *584 If the employee abandons his right to duty status and voluntarily requests annual or without pay leave status then this may be granted. The regulations emphasize the need for vol-untariness by italicizing the phrase “provided the submission of a written request for suoh leave is a completely volwitary action on the part of the employee.” The emphasis is reinforced by the next sentence which warns that “[ejnforced annual leave will not be directed by the installation for the purpose of removing the employee from a duty status.” It would seem, therefore, that by telling plaintiff he was not eligible for duty status yet requiring him to rewrite his request for annual and without pay status, Colonel Larsen was able to obtain pro forma compliance with the requirement of voluntariness and immediately remove plaintiff from the command. Plaintiff should now be compensated for the period he was wrongfully deprived of duty status.
in
There is no dispute that the acts charged were in fact done. Plaintiff’s principal plea is that the penalty of removal was too harsh in the light of both the nature of his single transgression and his long history of unblemished and superior Government service.
Recent decisions of this court have outlined the limited review functions of this court with respect to penalties. In Grover v. United States, 200 Ct. Cl. 337, 353 (1973) the court asserted:
* * * This court has stated on many occasions that the measure of the penalty is within the discretion of the agency. Birnholz v. United States, 199 Ct. Cl. 532 (1972); Heffron v. United States, 186 Ct. Cl. 474, 484, 405 F. 2d 1307, 1312 (1969); Liotta v. United States, 174 Ct. Cl. 91, 96 (1966); De Nigris v. United States, 169 Ct. Cl. 619, 625 (1965). There are, of course, exceptions to this general rule where it can 'be shown that the decision made by the agency was the product of abused discretion. The test for the abuse of discretion requires a showing by the plaintiff that the penalty is so harsh that there is “an inherent disproportion between offense and punishment.” Heffron v. United States, supra, 186 Ct. Cl. at 485, 405 F. 2d at 1312-13; Clark v. United States, 162 Ct. Cl. 477, 484 (1963).
*585 However, when such abuse of discretion has occurred, the court has not hesitated to set aside penalties, whether or not they have been within the range of permissible alternatives. Clark v. United States, 162 Ct. Cl. 477, 482-86 (1963); Jacobowitz v. United States, 191 Ct. Cl. 444, 458-59, 424 F. 2d 555, 563 (1970); Cuiffo v. United States, 131 Ct. Cl. 60, 68-70, 137 F. Supp. 944, 949-50 (1955) ; Power v. United States, ante at 126, 531 F. 2d 505 (1976); cf. Daub v. United States, 154 Ct. Cl. 434, 292 F. 2d 895 (1961).
Civilian Personnel Regulation C2 (Feb. 1964) provides that the severity of disciplinary action is left to the discretion of appropriate officials of the employing activity (para. 4-2.a.), but it does set out a list of suggested penalties. For the applicable offense, “False statements, misrepresentation, or fraud in application blank or other official records submitted to the Department of the Army”, the suggested range of penalties for a first offense is “5- to 10-day suspension, or removal.” (CPR C2, app. B, Table I (Feb. 1964).)
The trial judge concluded that, although the sanction of removal fell within the range of authorized penalties, the Department of the Army had abused its discretion in this instance. His main ground for this result was that the Department was under the misapprehension that, as a GS-12, Rifkin would never have been entitled to first-class carriage — that the line was always drawn between GS-12’s and GS-13’s — and therefore that he deliberately intended to and did defraud the United States by changing his travel orders to show that he was a GS-13. The trial judge said: “The undisputed testimony was that there was no fixed dividing-line between grades entitled to first class and grades entitled only to lesser accommodations. On some sailings GS-12’s were assigned first-class accommodations. It all depended on the blocks and mixes of accommodations booked in advance for a particular sailing by the MSTS officer in charge as compared to the actual demand therefor. Thus, it appears that assignment of preferred accommodations in order of rank or grade was merely an orderly method of allocation to suit the requirements of a particular day’s reservations. Accordingly, while plaintiff’s use of an altered travel authorization falsifying his grade was unquestionably an improper act *586 designed to obtain an unwarranted advantage over others, it does not necessarily follow, as Colonel Larsen assumed and Ms superiors accepted, that it was designed to or in fact did defraud the United States out of money or moneys worth to wMch under no circumstances was the plaintiff entitled.”
In addition the trial judge relied (as showing abuse of discretion) on (a) testimony by officials at the immediate level of command that plaintiff’s motivation was the higher prestige of being considered and treated as a GS-1S, not the desire to defraud the United States out of the $351 extra cost of first-class transportation on the vessel; (b) testimony that these first-level officials deliberately put out of their minds, as inappropriate considerations, their personal evaluations of “intent or human frailties, sympathy, or compassion”; and (c) the evidence that these same first-level officials mistakenly thought that they had a choice only between a minimal punishment (such as suspension for no more than 30 days) and the ultimate sanction of removal.
After setting aside, on these grounds, the penalty of removal imposed by the Department, the trial judge held, “[o]n an overall view of the evidence in the record and in light of the permanent adverse effect that plaintiff’s single transgression has already had on what was up to then a promising career,” that a suspension without pay in excess of 2y2 years would be unduly harsh and an abuse of discretion.
We do not agree with this evaluation and analysis and conclude, on the contrary, that the record does not show an abuse of discretion by the Department of the Army.
In the first place we think the trial judge’s approach slights the cardinal fact that the ultimate decision was made by the office of the Secretary of the Army. It is that decision we are reviewing, not the first or second level determinations made in Europe. And there is no convincing evidence that the Secretarial level was under the same misapprehensions as the first-level officers who testified at the trial and on whose evidence the trial judge rests so heavily. The grievance examiner had made all the points the trial judge now makes and her recommendation was forwarded up the line. Moreover, in the course of appealing the first-level decision plaintiff’s *587 counsel hammered[3] at his contention that no fraud had been committed against the United States and that there was no rigid classification putting all G-S-12’s in cabin class. That the departmental Employment Policy and Grievance Review Board considered all aspects of the case is also suggested by the fact that on its own initiative it specifically asked the European command for “a comprehensive report with respect to the bases for the first level review decision, consideration given to assessment of lesser penalty, equity of decision in appellant’s case when compared to certain ‘similar’ cases involving military personnel, and to the activity commander’s intention to replace appellant with a military officer.” [4] The Board came to its first decision only after receiving this report from Europe. After its attention was called to the ex parte communications discussed in Part IV infra, the Board reopened the proceedings to allow plaintiff’s counsel to comment on the hitherto ex parte communications and then reaffirmed its conclusion. Finally, the Board devoted a substantial part of its initial report to the aptness of the penalty and in that connection considered (and disagreed with) the grievance examiner’s recommendation. All in all, we cannot say that at the Secretarial level — whatever may be said of the first-level decision — the Department of the Army was under a misapprehension as to the pertinent facts or as to its full discretion and powers with respect to the scope of the penalty. That subject appears to have been given ample and careful consideration in Washington.
Second, it was not wrong for the Army to characterize plaintiff’s conduct as defrauding the United States. The fact is that on the particular voyage Mr. Rifkin (as a GS-12) was not entitled to first-class accommodations. By showing his travel authorization, which he had deliberately altered to state that he was a GS-13, he persuaded the purser to give him a first-class cabin on that trip. This cost the Government an additional $351. It is irrelevant that on some other crossing he might, as a GS-12, have been entitled to a first-class room. On the particular trip in question he was not so en *588 titled and he nevertheless sought to obtain that advantage by exhibiting an altered copy of his travel orders. It cannot be gainsaid that on that specific trip plaintiff’s actions cost the Federal Government an extra $351 which it would not have had to pay if he had not falsified his grade and which it was not required to pay under the cabin-demarcation pattern adopted for that voyage. Even in technical terms this was the misuse of an official document to def rand the United States. In more colloquial usage, allowable in civil adverse action proceedings, the United 'States is defrauded when an employee deliberately alters an official document so as to misrepresent its content for his own advantage. As we have said, there is no sufficient evidence that, when the case was decided at the Secretarial level, there was any misunderstanding by either side as to what was here involved in the concept of “defrauding the United States.” Whether or not that terminology would be correct in a criminal information or indictment, we think that it was not inappropriate for this adverse action proceeding. That Mr. Eifkin’s primary motivation may have been to enhance his own prestige rather than to cheat the Government does not serve to eliminate the element of fraud. He knew that he was a GS-12 not a GS-13; he deliberately altered the travel orders to show incorrectly that he was a GS-13; he deliberately exhibited the altered orders in oi’der to obtain a substantial advantage aboard ship; he knew that his elevation to first-class would cost the Government more money; and he was ready to cause that result in order to obtain the prestige (and comfort) of being considered a GS-43. The psychological motivation for these intentional and deliberate acts o'f cheating does not take the offense out of the category of defrauding.
Third, unlike the trial judge we cannot bring ourselves to hold that, in all the circumstances, the penalty of removal was unduly harsh or an abuse of discretion. The improper act was a knowing, willful and deliberate one — a few days before his trip plaintiff had directed his secretary to alter the grade and salary designation on his travel authorization and then to have the changed document reproduced in several copies; after discussing with the purser aboard the ship the possibility of obtaining first-class accommodations and learning that GS-13’s had such treatment he presented one *589 of the altered copies to the purser in order to show that he was a GS-13; upon debarking at New York plaintiff made arrangements for his return travel, again submitting the altered travel form; but after the disclosure of the alteration he requested the return of the incorrect forms and the substitution of correct ones before the return trip. The Army could rightly hold on this record that plaintiff knew what he was doing and knew that it was wrong. And as the departmental board stressed, Mr. Kifkin was a relatively high-level employee in a position of great trust. When such an employee deliberately changes an official document so as to make it falsely represent his status, in significant fashion, and then deliberately uses it so as to obtain a substantial advantage for himself, removal cannot be branded as disproportionate to the offense. See Birnholz v. United States, 199 Ct. Cl. 532 (1972); Grover v. United States, 200 Ct. Cl. 337, 353-354 (1973); Hoover v. United States, 206 Ct. Cl. 640, 648-49 513 F. 2d 603, 607-08 (1975).
It is not hypocrisy or lip-service to repeat that we are not allowed to substitute our judgment for that of the Army, that we can set aside the punishment only when we consider it an abuse of discretion or disproportionate to the offense. We cannot exercise clemency or give way to our sense of compassion in the same manner the employing agency can. This is another case in which a single misstep may ruin an employee’s otherwise unblemished career but we do not feel that the offense is so slight or the punishment so disproportionately heavy that as judges we can intervene — whatever we might have or might not have done as administrators. The responsibility for discipline lies with management and in this instance, though the sanction may have been severe, management’s discretion was not abused.
Fourth, the decisions in which we have set aside or reduced punishment, as unduly severe or disproportionate to the offense, are quite different from this. In Clark v. United States, 162 Ct. Cl. 477 (1963), the most serious offense was the occasional misuse of a Government-owned automobile by the employee’s family for private shopping; removal was plainly too harsh for such minor misconduct. Id. at 483-84. In Jacobowitz v. United States, 191 Ct. Cl. 444, 424 F. 2d 555 (1970), the only surviving offense was failure to promptly *590 process checks received from certain taxpayers. “This charge was minor in nature, was old, and plaintiff had already received a reprimand for it from his superior.” Id. at 459, 424 F. 2d at 563. In addition, government counsel tacitly agreed at oral argument that the employee would not have been discharged under that count if the other more serious (but reversed) count were not in the case. See id. at 458, 424 F. 2d at 563. As its opinion demonstrates, our recent decision in Power v. United States, ante at 126, is likewise no precedent here: “Defendant failed to substantiate a serious charge of alteration of weight tickets, but continued to advocate' dismissal based on two minor discrepancies. There is some doubt whether plaintiff actually filed false information, and there is even greater doubt that plaintiff submitted the de minimis claims knowingly, intentionally and with the purpose to defraud the Government. The year’s delay in bringing about plaintiff’s removal poses yet another question concerning the fairness of the overly harsh penalty.” Ante at 134-35 (emphasis in the original text).
IV
The court’s remand order of April 27, 1973, requested resolution of the issue with respect to the use of ex parte evidence against plaintiff. In Camero v. United States, 179 Ct. Cl. 520, 525-27, 375 F. 2d 777, 779-81 (1967) and Jarett v. United States, 195 Ct. Cl. 320, 330-32, 451 F. 2d 623, 628-29 (1971), the court held that the Government’s ex parte communications concerning the merits of a case to those responsible for the decision in proceedings prescribed by regulations to be based on evidence and adversary in nature invalidated a decision adverse to a Government employee.
Plaintiff alleges the improper use of at least 12 ex parte documents during the administrative appellate proceedings without the knowledge of plaintiff or his counsel. Plaintiff, however, identifies only one document, Colonel Larsen’s Memorandum for Eecord of May 20, 1965, sent to the Commanding Officer of the United States Army Communications Zone (COMZ) at Orleans. This document was not a communication to one having the responsibility for a decision in an adversary hearing on evidence; the purpose, as testified to by Colonel Larsen, was routine — to keep his own commander, *591 General Kyser, informed on matters pending within the Procurement Agency command.
When the American Federation of Government Employees (AFGE) raised the ex parte issue with the Army, plaintiff’s counsel was furnished three documents:
(1) The memorandum from the Employee Appeals Review Board to a Deputy Chief of Staff of the Commander in Chief, Europe, dated July 27, 1965, setting forth its recommendations with respect to plaintiff’s appeal and the grievance examiner’s report.
CPR E2.5-5.a. (Change 2, July 30,1963) allows the major commander to “prescribe the methods and procedures” for review, on the merits, of the transcript of the grievance hearing and the examiner’s report. Pursuant to this authority, an Employee Appeals Review Board was set up by CINC US AREUR to review the record and to make recommendations to him. It was not unreasonable for the Commander in Chief, Europe, to seek assistance from his staff, the members of which had not been involved in the case. The board made a complete review and report. This appears to be allowable under the regulations, and since the panel’s review was not an adversary hearing it was not inherently unfair or prejudicial.
(2) The comments on plaintiff’s appellate brief that were furnished the Secretary of the Army by the Commander in Chief, Europe, on March 2,1966.
This was prepared pursuant to a request by the Secretary of the Army for further information concerning the issues raised in plaintiff’s appellate brief to the Secretary. The request sought information with respect to: (a) basis for determination that removal rather than a lesser penalty was warranted, as recommended by examiner; (b) circumstances of the major “B” case, urged by plaintiff to show discriminatory treatment; and (c) intention of Colonel Larsen to fill the comptroller position with a military officer, also claimed by plaintiff.
With regard to an appeal to the Secretary of the Army from a major commander’s decision, CPR E2.5-6.a.(l) (Change 2, July 30,1963) provides:
*592 The employee’s request for review will be added to the appeal record along with any comments the activity commander or major commander wish to make, and will be forwarded through channels to the Office, Secretary of the Army. * * *
Since the regulations providing for such appeal specifically contemplate “comments” by the activity and major commander, and are silent concerning making such comments available to an appellant, it appears that such documents were proper.
Moreover, since the delegate of the Secretary of the Army made both documents (1) and (2) available to plaintiff, gave plaintiff’s counsel an opportunity to file a brief in response thereto and reconsidered his decision in the light of such brief, plaintiff has not been deprived of any rights granted by the regulations or which affect the basic fairness of the appeal proceeding.
(8) A July 2, 1965 letter from COMZ (Major General Kyser) to Commander in Chief, Europe.
Colonel Larsen had been keeping his immediate superior, Major General Kyser (COMZ), informed of his actions with respect to the Kifkin matter. After the grievance examiner’s report was issued on July 2,1965, General Kyser unilaterally wrote to the Commander in Chief, Europe, before whom plaintiff’s appeal was pending, without furnishing a copy to plaintiff, urging that the recommendations of the grievance examiner not be followed and that the removal be sustained. He stated “[t]hat fraud against the United States was committed is adequately established”; the removal of an employee in a position of trust who has failed with respect to honesty and integrity is necessary to promote the efficiency of the service; “[t]he retention of an employee who is known to have committed a fraud against the United States” would unfavorably affect the morale, integrity and high standards of conduct of other employees; and plaintiff’s fraudulent act could have been the basis of a prosecution which could have warranted a $10,000 fine and 5-years imprisonment.
General Kyser’s letter is troublesome. It sought to influence the result of an adversary hearing required to be based on evidence by imposing his own conclusions in the appeal. Since it urged that the grievance examiner’s recommenda *593 tion for a punishment less severe than discharge not be followed because the plaintiff was guilty of a fraud against the United States which could even have warranted fine and imprisonment, it was certainly prejudicial to plaintiff. Major General Kyser was Colonel Larsen’s direct superior and Colonel Larsen testified he conferred frequently with the 'general and his staff and kept them fully informed on everything he did in the Ri'fkin case, by memoranda, telephone and personally. Thus General Kyser’s perspective and views on the case were derived at least to some extent from Colonel Larsen, who was a party to the appeal. Colonel Larsen also testified that General Kyser was extremely concerned and upset about the Rifkin case and needed no convincing from him to write the letter to higher headquarters expressing his views about the case while the appeal was pending. The letter was in fact considered by the Commander in Chief, Europe, and his staff, in deciding the appeal, since it is expressly referred to in the memorandum dated 27 July 1965 from a panel set up by him, and is quoted in the letter to the Secretary of the Army dated 2 March 1966.
General Kyser’s letter of July 2, 1965, states that it is in compliance with USAREUR Regulation 690-32, paragraph 6 (b) (Feb. 8,1965). It is not clear that such regulation, which is set out below,[5] does authorize an ex parte communication of the sort at issue here. In any event, if it did, a regional regulation which would authorize ex parte comments such as those of General Kyser’s would be inconsistent with the entire adversary and evidentiary grievance procedure set up by the Army Civilian Personnel Regulations.
The trial judge concluded that General Kyser’s letter was so prejudicial to plaintiff as to destroy his right to a fair and impartial hearing before the Commander in Chief, Europe. The trial judge then went on to say that it was *594 unnecessary for him to decide, since be bad already determined that the penalty should be vacated for other reasons, whether the reconsideration of its decision by the Office of the Secretary of the Army after plaintiff was allowed to respond to the three ex parte documents (including General Kyser’s letter) was enough to cure the unfairness in the appeal to the major commander (Commander in Chief, Europe).
Unlike the trial judge, we must directly face the impact in these proceedings of General Kyser’s communication. We hold that any error at the European level in receiving and considering this letter ex parte was cured and rendered harmless at the level of the Secretary of the Army. There the document was made available (along with the other two) to plaintiff, and his counsel had the opportunity to comment on the letter; thereafter the Employment Policy and Grievance Review Board reconvened to reconsider the matter and the office of the Secretary reconfirmed its decision upholding the removal. It is the decision of the office of the Secretary that we are now reviewing — not the lower level decision of Colonel Larsen or of the Commander in Chief, Europe — and by the time the decision at the Secretarial level was finally made and issued there was no longer any ex parte influence on, or communication to, the deciding authority. 'Our ruling with respect to General Kyser’s letter is the same as the holding of the trial judge (and ours) with respect to the other two ex parte documents. See supra.
y
We add a few words on laches. Because we sustain the defendant in removing plaintiff, we need not consider whether his broad claim would be barred in whole or in part by laches. We have, however, allowed him recovery of back pay for the early period from April 13, 1965 to August 30, 1965 (the period during which he was entitled to remain in duty status). See Part II, supra. Even if laches were to bar the rest of his claim, there is authority for carving out this early period. In Chappelle v. United States, 168 Ct. Cl. 362 (1964), although the suit was brought more than five and one-half years after accrual, the court struck down a defense *595 of laches because the employee himself limited the claim to an early period for which he would have been entitled to recover had he brought suit more promptly. See also Cason v. United States, 200 Ct. Cl. 424, 471 F. 2d 1225 (1973). The same principle applies here with respect to the April 1965-August 1965 period for which back pay is awarded. Moreover, none of the factors which induce the application of laches is present for this part of the claim — the issue is purely one of law and there is no problem of lost records, unavailable witnesses, or faded memories; nor would the Government have been saved a double salary for this period if plaintiff had sued earlier.
CONCLUSION OE LAW
Plaintiff is entitled to recover only his back pay for the period from April 13, 1965 to August 30, 1965, and the amount thereof will be determined in further proceedings under Rule 131 (c). Plaintiff is not entitled to recover on any of the rest of his claim and that portion of the petition is dismissed.

 This opinion embodies the necessary findings of fact.

 There Is no contention that plaintiff qualified as one who could not remain overseas because of Immigration or repatriation requirements.

 Especially at the grievance hearing and in his brief which was forwarded to the Secretary of the Army.

 The quotation is from the first report of the Employment Policy and Grievance Review Board.

 “6. Processing Appeals Prom Adverse Actions, a. An Information copy of the Report of Inquiry and Grievance Record, which la forwarded directly to the Personnel and Administration Division, Headquarters USAREUR (CPR E2.5-4b), will be transmitted to the appropriate area commander. When the activity concerned reports directly to a staff division of Headquarters USAREUR, a copy of the Report of Inquiry and Grievance Record will be forwarded to the head of that staff division.
b. Immediately on receipt of the copy of the Report of Inquiry and Grievance Record by the commander Indicated in a above, a qualified staff officer will be designated to analyze the appeal and recommend appropriate action.”