Thomas C. NIBALI

v.

The UNITED STATES.

No. 207-74.

United States Court of Claims.

Dec. 13, 1978.

John F. Bufe, Washington, D. C., for plaintiff; Robert M. Tobias, Washington, D. C., attorney of record.

Sandra P. Spooner, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant. Peter A. T. Sartin, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, KASHIWA and KUNZIG, Judges.

## ON DEFENDANT'S EXCEPTIONS TO THE TRIAL JUDGE'S REPORT

### PER CURIAM:

This case is before the court on defendant's exceptions to the recommended deci-

sion of Senior Trial Judge Mastin G. White, filed on January 30, 1978. The plaintiff, a former Internal Revenue Service Agent, challenges a 1972 discharge by the Internal Revenue Service, and seeks back pay and reinstatement. The discharge was based mainly on the determination by the Service that in 1968 plaintiff solicited and received a $15,000 bribe from two taxpayers, Mrs. Mary Dokas and Seymour Ruff, Jr., in return for promised favorable treatment in an audit then being conducted of the federal income tax liabilities of those taxpayers and corporations through which they did business.[1] Prior to his discharge, plaintiff had been criminally prosecuted and acquitted on the same charges in two trials.

The case originally came before the court on cross-motions for summary judgment. The court concluded that proper disposition of the case required a trial. The court noted that there was a direct conflict between the testimony of Mrs. Dokas and Mr. Ruff that the plaintiff had solicited and received a bribe, and the plaintiff's testimony denying those accusations; that although there had been an administrative hearing before the Civil Service Commission, the taxpayers had not testified at that proceeding; and that "the two bribe charges cannot be sustained without accepting the testimony of Mr. Ruff and Mrs. Dokas." The court stated that on the written record before it the court was "uncertain whether the administrative finders had adequate support for their determinations"; that that question "depends on the credibility of the conflicting testimony which, in turn could well be markedly influenced by demeanor and personal observation"; and that "this is one of those personnel cases in this court which merit a trial here of the facts, even though an administrative proceeding and hearing have been had." The court accordingly remanded the case to the Trial Division "for further proceedings to ascertain the facts." 210 Ct.Cl. 689 (1976).

---

1. The plaintiff also was found to have made false statements in connection with the audit. In remanding the case to the Trial Division, however, the court stated that the latter charge alone would not sustain the discharge.

After a 2-day trial at which plaintiff, Mrs. Dokas and Mr. Ruff were the only witnesses and at which the plaintiff and the taxpayers again gave directly conflicting testimony, the trial judge held that "the administrative determination to the effect that the plaintiff did solicit and accept a bribe is not supported by substantial evidence." The trial judge stated that none of the three witnesses "was really shaken on cross-examination with respect to the contradictory testimony that they gave regarding the alleged bribe" or "gave any clear indication, by his or her demeanor on the stand, as to which of them was committing perjury." The trial judge discussed six "[f]actors of special significance" which made "the versions given by Mrs. Dokas and Mr. Ruff, Jr. * * * inherently implausible, while the plaintiff's version is inherently reasonable."

Based on our examination of the administrative record and the record before the trial judge, we agree with him that the administrative determination that plaintiff solicited and accepted a bribe is not supported by substantial evidence. We adopt, with minor modifications and certain additions, the trial judge's opinion and findings as the basis for our decision in this case.[2]

The defendant argues, however, that since there is evidence in the record that the Internal Revenue Service and the Civil Service Commission credited, which supports the administrative determination, that determination necessarily has substantial evidentiary basis. It contends that under accepted standards of judicial review we have no warrant to reverse that determination.

Although the legal proposition upon which the defendant relies is sound, it does not cover the unique situation here. The existence of substantial evidence to support the administrative determination in this case depends upon whose testimony is credited—the taxpayers' or the plaintiff's; as we pointed out in remanding this case for

trial, "the two bribe charges cannot be sustained without accepting the testimony of Mr. Ruff and Mrs. Dokas." The defendant's argument assumes the very fact that our remand to the trial judge was designed to resolve, namely, was it plaintiff or the taxpayers who told the truth?

Although the trial judge was unable to resolve the credibility issue on the basis of the witnesses' demeanor—as we hoped he might—he ultimately concluded, on the basis of all the evidence in the record, that the testimony of the plaintiff was believable and that of the taxpayers was unworthy of belief. The trail judge thus did resolve the credibility issue in favor of plaintiff, albeit not on the basis of the witnesses' demeanor but rather in light of all the evidence in the record.

■ Since we reach the same conclusion he did, it necessarily follows that the administrative determination is not supported by substantial evidence. In so holding, we are not deciding the case *de novo* or substituting our judgment for that of the Internal Revenue Service and the Civil Service Commission, as defendant alleges. Rather, we are applying the settled principle that an administrative determination not supported by substantial evidence cannot stand. *Cf. Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Farmers Cooperative Co. v. National Labor Relations Board*, 208 F.2d 296, 303–04 (8th Cir. 1953); *Victor Products Corp. v. National Labor Relations Board*, 93 U.S.App.D.C. 56, 208 F.2d 834, 838–839 (1953); *National Labor Relations Board v. Payless Cashway Lumber Store*, 508 F.2d 24, 27–28 (8th Cir. 1974).

### OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

Thomas C. Nibali, the plaintiff in this case, was an Internal Revenue Agent for

---

2. Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

approximately 23 years. He was assigned to the Baltimore District Office of the Internal Revenue Service ("the IRS") throughout the entire period. The plaintiff complains in the present case of his discharge by the IRS effective January 28, 1972, on charges that in 1968 he solicited and accepted a $15,000 bribe from two taxpayers, Mrs. Mary Dokas ("Mrs. Dokas") and Seymour Ruff, Jr. ("Mr. Ruff, Jr."), in return for undue tax benefits.

After the plaintiff filed his petition with the Court of Claims on June 14, 1974, the parties filed cross-motions for summary judgment. These motions were denied by a panel of the court in an order which was dated May 28, 1976, and which remanded the case to the trial division for further proceedings to ascertain the facts. A motion for a rehearing *en banc* was subsequently filed by the defendant; and this motion was denied by the court on September 30, 1976.

The customary pretrial proceedings were completed; and a trial was then held in April 1977. The plaintiff, Mrs. Dokas, and Mr. Ruff, Jr. were all witnesses and gave extensive testimony at the trial. Both Mrs. Dokas and Mr. Ruff, Jr. testified that the plaintiff solicited a $15,000 bribe from them; and Mrs. Dokas testified that the money was paid to the plaintiff. The plaintiff testified that he never solicited or received any money from Mrs. Dokas or Mr. Ruff, Jr. Thus, the trial was essentially a "swearing match" between Mrs. Dokas and Mr. Ruff, Jr., on one side, and the plaintiff, on the other side.

The plaintiff's troubles began in December 1968, when an accountant named Merrill Sumey ("Mr. Sumey") informed an internal revenue agent of a conversation which he had previously had in November 1968 with Mr. Ruff, Jr. In that conversation, Mr. Ruff, Jr. told Mr. Sumey that he and Mrs. Dokas had decided to accept an offer for the settlement of certain federal tax demands against them; that the amount involved in the settlement was $15,-000; and that the money ultimately was to go to an internal revenue supervisor.

On the basis of the information furnished by Mr. Sumey, the IRS conducted an investigation. As a result of the investigation, the plaintiff was indicted on February 16, 1971, in the United States District Court for the District of Maryland. The indictment charged that the plaintiff solicited and accepted $15,000 from Mrs. Dokas and Mr. Ruff, Jr. in return for undue tax benefits.

Following the indictment, the IRS suspended the plaintiff indefinitely, effective February 23, 1971, pending the outcome of the criminal prosecution.

In May 1971, the plaintiff was tried before a jury on the indictment previously mentioned. The result of the trial was a hung jury on the charge of soliciting a bribe, and acquittal on the charge of accepting a bribe.

Subsequent to the May 1971 trial, a superseding indictment was returned against the plaintiff in the United States District Court for the District of Maryland. This indictment charged the plaintiff with soliciting a $15,000 bribe from Mrs. Dokas and Mr. Ruff, Jr., and also with making false statements in the audit report concerning these taxpayers.

The plaintiff was tried before a jury on the second indictment; and he was acquitted of all charges on December 21, 1971.

Following his acquittal on December 21, 1971, the plaintiff was reinstated by the IRS on the same day, and then was immediately placed on administrative leave. Two days later, the IRS issued to the plaintiff a notice of proposed adverse action, involving (1) his suspension during the 30-day statutory period, and (2) his dismissal thereafter for soliciting and accepting a $15,000 bribe from Mrs. Dokas and Mr. Ruff, Jr.[1]

An oral hearing before the District Director of the Baltimore District Office of the IRS was held on the administrative

---

1. The notice also contained a charge that the plaintiff had made false statements in the audit report concerning Mrs. Dokas and Mr. Ruff, Jr.; but that charge is not involved in the present litigation.

charges against the plaintiff; the charges were sustained by the District Director; and the plaintiff was dismissed by the IRS effective January 28, 1972.

Following the exhaustion of his administrative remedies before the Civil Service Commission, including its Board of Appeals and Review, the plaintiff instituted the present litigation in the Court of Claims.

The bribery charges against the plaintiff grew out of a tax audit which involved three individuals and five corporations, and which spanned both fiscal years and calendar years during the period from January 1964 to January 1968. (This audit will usually be referred to hereafter in the opinion as "the Dokas-Ruff audit.") The individuals principally involved in the Dokas-Ruff audit were Mrs. Dokas and Mr. Ruff, Jr.; but Seymour Ruff, Sr. ("Mr. Ruff, Sr."), the father of Mr. Ruff, Jr., was also involved to a minor extent. The five corporations were Metro Land Company, Fieldstone Development Company, Highland Development Company, Westchester Development Company, and a payroll corporation known as S.W.R., Inc.

Mr. Ruff, Jr. and Mrs. Dokas were in the business of building and selling residential homes through the operation of the five corporations mentioned in the preceding paragraph. Mr. Ruff, Jr. owned 70 percent and Mrs. Dokas owned the remaining 30 percent of the stock in all five corporations.

At the time of the occurrence of the events with which the court is concerned in the present case, the plaintiff, after advancing steadily in the Baltimore District Office of the IRS through positions in grades GS–7, GS–9, GS–11, and GS–12, was a GS–13 Field Audit Group Supervisor in the Audit Division of the Baltimore District Office. As a group supervisor, he was responsible for overseeing and evaluating the work of 14 revenue agents. His duties included the assignment of cases to the revenue agents in his group, supervising the employees assigned to the group, and making job-site visitations to taxpayers' offices for the purpose of overseeing audits that were being conducted by revenue agents of the group.

The plaintiff was also responsible for ensuring that all prescribed procedures were followed, and for examining each case after the conclusion of the audit, approving it, and sending it on to the review staff for final approval.

The Dokas-Ruff audit first came to the plaintiff's attention on or about July 1, 1968, when Revenue Agent Linwood Jennings was transferred into the plaintiff's group. It was standard procedure in the Baltimore District Office of the IRS for a transferred revenue agent to retain his pending cases when assigned to a new group. Thus, when Revenue Agent Jennings came under the plaintiff's supervision on or about July 1, 1968, he brought the Dokas-Ruff audit with him, along with other pending cases. At that time, Revenue Agent Jennings had spent approximately 218 hours on the Dokas-Ruff audit, beginning in April 1966, and he was experiencing great difficulty in closing the audit.

Within a week after Revenue Agent Jennings came under his supervision, the plaintiff reviewed the Dokas-Ruff audit and then discussed it with Revenue Agent Jennings and with his own immediate superior, Branch Chief Charles B. Chandler. The plaintiff and Branch Chief Chandler noted the delay of 2½ years in the processing of the Dokas-Ruff audit; they discussed the need to expedite the closing of the audit; and they agreed that, in order to close the case as quickly as possible, the plaintiff should personally accompany the examining revenue agent on as many visits to the taxpayers' place of business as might be necessary to finish the job.

In July 1968, reasonably soon after the plaintiff acquainted himself with the Dokas-Ruff audit, he made his first visit to the taxpayers' place of business. Arrangements for the visit were made in advance with Mrs. Dokas and Mr. Ruff, Jr. by Revenue Agent Jennings over the telephone. Revenue Agent Jennings accompanied the plaintiff on the visit. At the July 1968 meeting with Mrs. Dokas and Mr. Ruff, Jr., the plaintiff indicated to them that the Government had spent enough time, effort,

and money in trying to resolve the issues involved in the audit, and that he wanted to get it wrapped up and finished.

The plaintiff and Revenue Agent Jennings made another visit to the taxpayers' place of business on September 4, 1968. As of that time, the work papers of Revenue Agent Jennings indicated that the five corporations, through which Mrs. Dokas and Mr. Ruff, Jr. operated, did not owe any additional taxes, but that additional taxes in the total amount of $64,000 were owed by the individuals involved in the Dokas-Ruff audit. Revenue Agent Jennings and the plaintiff informed Mrs. Dokas and Mr. Ruff, Jr. at the meeting on September 4, 1968, regarding the potential tax liability of $64,000 against the individual taxpayers, based on Revenue Agent Jennings' determination.

On September 17, 1968, Revenue Agent Jennings wrote a referral report to the Intelligence Division of the Baltimore District Office concerning the Dokas-Ruff audit. Revenue Agent Jennings suspected that fraud had been committed in connection with certain transactions between Metro Land Company and its two stockholders, Mrs. Dokas and Mr. Ruff, Jr. Before this report was prepared, Revenue Agent Jennings discussed the matter of a possible fraud referral with the plaintiff, and the plaintiff discussed the matter with his immediate superior, Branch Chief Chandler. The referral report, after being written by Revenue Agent Jennings, was signed by him, by the plaintiff, and by Branch Chief Chandler, and was then forwarded to the Intelligence Division for consideration and action.

Shortly after September 17, 1968, Revenue Agent Jennings gave notice that he was leaving the IRS. He subsequently left the employ of that agency on September 27, 1978.

Before leaving the IRS, Revenue Agent Jennings reversed his earlier determination that the individual taxpayers involved in the Dokas-Ruff audit owed additional taxes in a total amount of $64,000. He had concluded in connection with the fraud referral report that all the corporations involved in the Dokas-Ruff audit had sustained losses; and when this conclusion was reconsidered by Revenue Agent Jennings in relation to certain existing inter-company loans and their effect on the stockholders, it was Revenue Agent Jennings' revised determination that no additional tax was owed by any of the corporations or by any of the individuals involved in the Dokas-Ruff audit, and that, instead, Mrs. Dokas and Mr. Ruff, Jr. were entitled to refunds in the total amount of approximately $8,000. Revenue Agent Jennings, before leaving the IRS, informed the plaintiff of his revised determination regarding the Dokas-Ruff audit.

When Revenue Agent Jennings left the IRS on September 27, 1968, after having spent a total of 493 hours on the Dokas-Ruff audit, the revised determination mentioned in the preceding paragraph was reflected in his work papers, but he had not prepared an audit report (other than the referral report to the Intelligence Division) and the Dokas-Ruff audit was incomplete. Someone was needed to organize the information that was contained in Revenue Agent Jennings' work papers, prepare a report, and complete the audit.

Mrs. Dokas and Mr. Ruff, Jr. went to the plaintiff's office on October 1, 1968, for a conference regarding the Dokas-Ruff audit. The status of the audit (except for the aspect that had been referred to the Intelligence Division for a fraud investigation) was discussed by the conferees. During the course of the conference, the plaintiff loaned Mrs. Dokas some work papers relating to the audit, so that they could be used in preparing delinquent tax returns.

Mr. Ruff, Jr. testified that during the course of the conference in the plaintiff's office on October 1, 1968, the plaintiff indicated that for $15,000 the audit figures could be made to show not only that there was no tax liability on the part of anyone involved in the audit, but that the taxpayers were entitled to tax refunds of some $7,000 or $8,000; that he (Mr. Ruff, Jr.) inquired whether he could pay the $15,000 by check, and the plaintiff replied that it

would have to be in cash; that the plaintiff said that the payment should be made within a 30-day period of time, as his supervisor wanted him to get the case wrapped up; and that Mr. Ruff, Jr. and Mrs. Dokas then indicated to the plaintiff that they would try to raise the money.

Mrs. Dokas testified that the plaintiff brought up the subject of $15,000 at the conference on October 1, 1968, but she could not remember just how the matter arose in the conversation; that it was her understanding that the pending tax matters would be settled and the taxpayers would come out with refunds, which would be applied toward the payment of certain payroll taxes; that the plaintiff wanted to close the transaction within 30 days; and that she and Mr. Ruff, Jr. indicated that they would try to raise the money.

The plaintiff testified that he did not, at the conference on October 1, 1968, or at any other time, ask or in any way solicit Mrs. Dokas or Mr. Ruff, Jr. for any money in connection with the Dokas-Ruff audit, or for any other purpose. He further testified that at the conference on October 1, 1968, he informed Mrs. Dokas and Mr. Ruff, Jr. of Revenue Agent Jennings' revised determination that none of the corporations or individuals involved in the Dokas-Ruff audit owed any additional tax and that, instead, Mrs. Dokas and Mr. Ruff, Jr. were entitled to tax refunds in the total amount of approximately $8,000; and that he also informed Mrs. Dokas and Mr. Ruff, Jr. that another revenue agent would soon be assigned to complete the audit.

On or about October 3, 1968, following Revenue Agent Jennings' departure from the IRS, the plaintiff, with the approval of Branch Chief Chandler, assigned the Dokas-Ruff audit to Revenue Agent Patricia Cornelius. As of that time, the audit was approximately 2½ years old, and revenue agents (including the plaintiff) had devoted approximately 680 hours to the case. In view of the excessive delay in disposing of the case, and as it would have taken Revenue Agent Cornelius a substantial amount of time to familiarize herself thoroughly

with the case, Branch Chief Chandler and the plaintiff decided that the plaintiff should personally direct the completion of the audit. Accordingly, the plaintiff, with the approval of Branch Chief Chandler, expedited the completion of the audit by personally doing the major part of the work that was necessary in order to complete the audit and prepare the final report. Revenue Agent Cornelius rendered assistance by making certain computations which Revenue Agent Jennings had failed to perform; and she also drafted the final audit report.

Pursuant to arrangements made by the plaintiff, he and Revenue Agent Cornelius had a conference with Mrs. Dokas and Mr. Ruff, Jr. on November 27, 1968, for the purpose of closing out the Dokas-Ruff audit. The meeting was held in the office of Mr. Ruff, Jr., on the second floor of the building where Mr. Ruff, Jr. and Mrs. Dokas carried on their business. At the conference, the final audit results were communicated to Mrs. Dokas and Mr. Ruff, Jr., i. e., that no additional tax was owed by any of the corporations or individuals involved in the audit, and that the combination of corporation losses and loans made by Mrs. Dokas and Mr. Ruff, Jr. to the corporations entitled Mrs. Dokas and Mr. Ruff, Jr. to tax refunds in the total amount of approximately $8,300. Mrs. Dokas and Mr. Ruff, Jr. agreed with these results, and they signified their agreement by signing an agreement form.

At the conclusion of the conference on November 27, 1968, Mrs. Dokas handed a manila envelope to the plaintiff. Mrs. Dokas testified that the envelope contained $15,000 in currency. On the other hand, the plaintiff testified that the manila envelope contained the work papers which he had loaned to Mrs. Dokas on a previous occasion. He further testified that he had never received any money from Mrs. Dokas, or from Mr. Ruff, Jr., in connection with the Dokas-Ruff audit, or in connection with any other matter.

None of the key witnesses—Mrs. Dokas, Mr. Ruff, Jr., or the plaintiff—was really shaken on cross-examination with respect to

the contradictory testimony that they gave regarding the alleged bribe. Furthermore, none of these witnesses gave any clear indication, by his or her demeanor on the stand, as to which of them was committing perjury. Hence, the ascertainment of the truth is a very difficult task.

It is the basic reaction of the trier of the facts that the versions given by Mrs. Dokas and Mr. Ruff, Jr. are inherently implausible, while the plaintiff's version is inherently reasonable. This is doubtless why juries found the plaintiff "not guilty" of the very same charges on which the plaintiff was dismissed by the IRS.

■ Factors of special significance are outlined in the following numbered paragraphs:

1. The scene of the alleged solicitation of a $15,000 bribe by the plaintiff is worthy of note. As indicated earlier in this opinion, the incident allegedly occurred in the plaintiff's office. Although the evidence shows that only the plaintiff, Mrs. Dokas, and Mr. Ruff, Jr. were physically present in the plaintiff's office during the conference on October 1, 1968, the evidence also shows: that the plaintiff's secretary, Mrs. Joanne Swimm, was seated at her desk throughout the conference; that her desk was located just outside the plaintiff's office and near the door leading into the office; that the distance between Mrs. Swimm's desk and the plaintiff's desk, where he was seated during the conference with Mrs. Dokas and Mr. Ruff, Jr., was about 6 feet; that the door leading into the plaintiff's office was open throughout the conference; that the conference was conducted in ordinary conversational tones; that Mrs. Swimm could hear the voices of the conferees; and that she did not hear the plaintiff say anything to Mrs. Dokas and Mr. Ruff, Jr. about adjusting their tax figures in return for $15,000. It would strain the credulity of any reasonable person to believe that the plaintiff—an experienced internal revenue agent, who had been sufficiently astute to rise through the ranks to a responsible position as a GS-13 supervisor—would have been stupid enough to jeopardize his career by baldly soliciting a $15,000 bribe from people with whom he was only slightly acquainted, all in the hearing, and virtually in the presence, of his secretary.

2. At the time of the conference on October 1, 1968, when the plaintiff allegedly solicited a $15,000 bribe from Mrs. Dokas and Mr. Ruff, Jr., the plaintiff knew that about 2 weeks previously the Audit Division of the Baltimore District Office had recommended to the Intelligence Division that Mrs. Dokas and Mr. Ruff, Jr., be investigated for possible fraud in connection with one aspect of the Dokas-Ruff audit. Pursuant to IRS regulations, such a fraud investigation would be conducted entirely by the Intelligence Division; and no one in the Audit Division, including the plaintiff, would have any control whatsoever over the conduct of the investigation. Again, it cannot reasonably be believed that an Internal Revenue agent of the plaintiff's experience and intelligence would be so reckless as to solicit a bribe from persons who (so far as he knew) would soon be the subjects of a fraud investigation—and would probably be interviewed—by the Intelligence Division with respect to one aspect of the very same audit in connection with which he was attempting to obtain a bribe from the taxpayers.

3. The testimony of both Mrs. Dokas and Mr. Ruff, Jr., was to the effect that when the plaintiff made the solicitation, they promptly, and without any discussion of the matter between themselves, agreed to commit the crime of bribing an Internal Revenue agent, if they could raise the money with which to pay the bribe. Such behavior does not fit into the conduct pattern of knowledgeable business people, such as Mrs. Dokas and Mr. Ruff.

4. According to Mrs. Dokas, the plaintiff arranged in advance to have the $15,000 bribe delivered to him at the conference on November 27, 1968, which the plaintiff planned to attend with Revenue Agent Cornelius. It is difficult to believe that the plaintiff would arrange to have bribe money delivered to him in the presence of another Internal Revenue Agent, who had no

connection with the alleged bribery scheme. Even a half-bright bribee would undoubtedly have sense enough to arrange for the bribe money to be paid over at a place and time affording some reasonable degree of privacy.

5. [Added by the court.] There are conflicts in the testimony of Mr. Ruff, Jr., and Mrs. Dokas concerning both the October 1, 1968 meeting at which the plaintiff allegedly solicited the bribe, and the November 27, 1968 meeting at which the money allegedly was paid to him. According to Mr. Ruff, Jr., the plaintiff stated at the October 1 meeting that the preliminary results of the audit showed that the individual taxpayers owed an additional $64,000. Mrs. Dokas' testimony, however, was that the additional amount the plaintiff said—both at that meeting and subsequently—they owed was $40,000–$45,000. With respect to the November 27 meeting, Mrs. Dokas testified that she took the envelope containing the $15,000 from the safe on the first floor, carried it upstairs and placed it on Mr. Ruff, Jr.'s desk before the meeting started. Mr. Ruff, Jr., however, testified that Mrs. Dokas did not initially bring the envelope containing the money to the second floor meeting but picked it up when, during the meeting, she went down to the first floor to get the corporate seals to affix to the corporate tax returns that were signed at the meeting.

6. After the bribery allegations against the plaintiff arose, the IRS and federal prosecutors thoroughly examined the plaintiff's entire personal financial situation, and they never found any trace indicating that the plaintiff had actually received the alleged $15,000 of bribe money.

7. The evidence in the record indicates that the plaintiff's reputation for truthfulness and integrity is superior to that of Mrs. Dokas or Mr. Ruff, Jr.

It should be mentioned, before concluding the discussion, that the version of the alleged bribery scheme presented by Mrs. Dokas and Mr. Ruff, Jr., derives some support from certain circumstantial evidence in the case. Sometime around the middle of October 1968 (i. e., about 2 weeks after the meeting at which the plaintiff allegedly solicited the $15,000 bribe), Mr. Ruff, Jr., went to see his father, Mr. Ruff, Sr., and told the latter that the tax audit was about to be wrapped up; that it had been indicated that the individuals involved in the audit owed a substantial amount of taxes, but the liability could be settled for $15,000 if a prompt settlement could be arranged; and that he (Mr. Ruff, Jr.) did not have any money with which to pay the $15,000. Mr. Ruff, Sr., informed his son that he would try to raise the money. Subsequently, Mr. Ruff, Sr., went to the Equitable Trust Company and arranged to obtain a loan in the amount of $15,000 from that company. On November 27, 1968, the Equitable Trust Company issued a check for $15,000 to Mr. Ruff, Sr.; and Mr. Ruff, Sr., cashed the check at a bank, as his son had told him that the $15,000 was needed in cash. Late in the morning of November 27, 1968, Mr. Ruff, Sr., delivered a brown paper bag containing the cash to Mrs. Dokas in her office on the first floor of the building where she and Mr. Ruff, Jr., carried on their business.

The defendant urges that it was more than a mere coincidence that the $15,000 was delivered by Mr. Ruff, Sr., to Mrs. Dokas on the same day that the plaintiff and Revenue Agent Cornelius came to the same building for a closing conference with Mrs. Dokas and Mr. Ruff, Jr. The evidence in the record, however, provides a reasonable explanation for the scheduling of the closing conference on November 27, 1968. When Revenue Agent Cornelius—after the Dokas-Ruff audit was assigned to her on October 3, 1968—began the task of drafting the final report, she discovered that the tax returns of Mrs. Dokas and Mr. Ruff, Jr., for one year were not in the files; and she requisitioned the missing returns from the IRS. Revenue Agent Cornelius wanted the files to be complete when the closing conference was held with the taxpayers. One of the missing returns was received on November 22 and the other on November 25, 1968. Revenue Agent Cornelius was then ready for a closing conference with the

taxpayers, and she so informed the plaintiff. Arrangements for the closing conference to be held on November 27, 1968, were thereupon made by the plaintiff.

The defendant argues that the credibility of Mrs. Dokas and Mr. Ruff, Jr., derives support from the circumstance that, when they first told government investigators about the alleged bribery scheme, they were acting against their pecuniary interests. The defendant's reasoning is that Mrs. Dokas and Mr. Ruff, Jr., believed at the time that the $15,000 which they had paid the plaintiff enabled them to evade the payment of taxes in the amount of $64,000, and that, upon the disclosure of the bribe, they would have to pay the $64,000 in taxes, as well as lose the $15,000 that they had previously paid out as a bribe. This line of reasoning presupposes that Mrs. Dokas and Mr. Ruff, Jr., actually paid the plaintiff $15,000 in the belief that they were thereby evading a higher tax liability. Of course, the truthfulness of the Dokas-Ruff, Jr., version of the alleged $15,000 payment— against the plaintiff's unequivocal denial— is the very issue before the court in the present case.

There is no convincing evidence in the record regarding the ultimate disposition of the $15,000 which Mr. Ruff, Sr., delivered to Mrs. Dokas. The record does show that, during the period with which the court is concerned in the present case, the five corporations through which Mrs. Dokas and Mr. Ruff, Jr., conducted their business were dormant and heavily in debt; that the corporations together owed more than 100 creditors a total of from $200,000 to $250,-000; and that Mrs. Dokas and Mr. Ruff, Jr., were "flat broke" and were personally in debt to the extent of approximately $80,000 (over and above the corporate indebtedness) on obligations which they had incurred personally in obtaining funds for the corporations.

The administrative determination to the effect that the plaintiff did solicit and accept a bribe is not supported by substantial evidence.

Accordingly, the plaintiff is entitled to recover a monetary judgment and to be restored to the position from which he was unlawfully removed.

### CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which, as modified and expanded, the court adopts, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect. The case is remanded to the Trial Division for a determination of the amount of the recovery, in accordance with Rule 131(c).

As an incident of and collateral to this judgment, the Commissioner of Internal Revenue is directed to restore the plaintiff to the position from which he was unlawfully dismissed.