Leroy L. WISE

v.

The UNITED STATES.

No. 362–77.

United States Court of Claims.

July 18, 1979.

Plaintiff, Leroy L. Wise, was employed as a criminal investigator (special agent) with the Internal Revenue Service (IRS or agency) for some 15 years; his record was apparently unblemished. On December 4, 1975, he received a notice of proposed adverse action for his removal, signed by the Chief of the Intelligence Division of the Springfield (Illinois) District, IRS. Reasons for the proposed removal were three—

(I) that plaintiff had misused Government funds because he had not obtained advance approval of expenditures for which he sought reimbursement from the Imprest Fund Account;

(II) that plaintiff failed to comply with section 9373.1 of the Internal Revenue Service Regulations regarding the identity of informants; and

(III) that plaintiff made certain intentionally false or misleading statements in matters of official interest.

On December 30, 1975, plaintiff replied in writing to the allegations in the notice. Thereafter, plaintiff was discharged on the basis of a determination by the agency that the charges were true. The decision became effective February 6, 1976. At the time of his removal, plaintiff was a GS–12 (step 5) special agent with an annual salary of $21,970.

Plaintiff thereupon perfected a timely appeal to the United States Civil Service Commission, Federal Employee Appeals Authority (FEAA). Following a hearing before an appeals officer, Reason I was dismissed on the merits; specification 5 of Reason III was dismissed on procedural grounds; Reason II and the remainder of Reason III, except for a portion of specification 4 thereof, were sustained; and the adverse action was affirmed. Plaintiff filed this action on July 5, 1977, seeking restoration to his position with the IRS and back pay on the grounds that the charges sustained by the FEAA were not supported by substantial evidence and that the penalty of removal was unduly harsh and excessive in view of the infraction.

William E. Persina, Washington, D. C., for plaintiff; Robert M. Tobias, Washington, D. C., attorney of record. Richard P. Theis, National Treasury Emp. Union, Washington, D. C., of counsel.

Donnie Hoover, Washington, D. C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D. C., for defendant.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and SMITH, Judge.

ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

SMITH, Judge:

This civilian adverse action case is before us on the parties' cross-motions for summary judgment. Having heard oral argument and having carefully reviewed the administrative record and submissions of the parties, we deny plaintiff's motion for summary judgment, grant defendant's cross-motion for summary judgment, and dismiss the petition.

## Background

This case arises from the use of confidential informants in the Springfield District of the Internal Revenue Service. Plaintiff, as a special agent with the Intelligence Division, in the course of planning and conducting tax evasion investigations, was required to develop sources of investigative information. Among these sources is the "confidential informant," that is, one who furnishes information on the expectation that his identity will not be disclosed. Special agents rely greatly on such informants to perform their jobs, and they will generally go to great lengths to protect informants' identities. Indeed, the Internal Revenue Manual (IRM) provides that if a special agent is directed by a court, under pain of contempt, to divulge the true name of an informant who has been promised strict confidentiality, he should, under certain circumstances, maintain the confidentiality, pending instructions from his superiors.[1] However, the manual is also clear that, although the agent should go to great lengths to protect an informant's identity, definite assurance of confidentiality cannot be given the informant, as an agent may be required to disclose the informant's identity to his superiors. Circumstances requiring such disclosure generally involve situations either where the integrity of the special agent is at issue or where a paid informant is involved.[2]

Prior to 1972, the use of confidential informants in the Springfield District was rare. Max E. Hollenbeck, Assistant Chief of Intelligence, Springfield District, 1959 to 1967, and Chief of Intelligence, Springfield District, 1967 to January 1972, testified that, during his tenure, the use of confidential informants was so unusual that no procedures had been established for recording the real names of an agent's informants; each agent was expected to keep his informant's identity to himself. In April 1972, when John M. Walsh became Chief of Intelligence, the policy changed. Walsh had previously worked in the Chicago District where informants were used extensively and, on becoming Chief at Springfield, he sought to remedy what he saw as a "floundering" system of informant use. Training sessions began to emphasize the use of confidential informants, and the development of informants became a factor in employee evaluation and promotion.

Walsh also instituted a system for reporting the true name of the informant. The agent would request a "confidential informant number" from his group supervisor; the supervisor would assign a number to the agent and give the agent a pink envelope and a blank piece of paper. The agent would place the informant's name on the paper, put the slip of paper in the envelope, and seal the envelope. The assigned number was printed on the outside of the envelope, and the agent's name was placed opposite the number of a separate "control" list. The envelopes were entrusted to the supervisors. Plaintiff's supervisor, Gerald Schaefer, kept the envelopes locked in a filing cabinet in his office. The purpose of the system was to protect the agent, primarily where an agent was accused of improper association with a "nefarious" character or in the event an agent were killed or injured in the line of duty. Although there is no direct evidence that special agents, including plaintiff, were expressly instructed that an informant's true name had to be placed in the pink envelope, there is ample testimony that the use of a fictitious name would defeat the whole purpose of the system instituted by Walsh.

In the fall of 1973, plaintiff developed a confidential informant known as "SP–59." SP–59 was a former special agent in the Springfield District who had left the IRS earlier in 1973 to become an employee of the Illinois State Department of the Treasury in the Income Tax Division. SP–59 and plaintiff had known each other over 12 years, although their "social relationship" had been limited to employment-related social events. In view of SP–59's prior associ-

---

1. IRM § 232.23(2)(b) (Jan. 29, 1975).

2. IRM § 9373.1(5) (Feb. 19, 1975); *see also* IRM § 9371.1(4) (Aug. 13, 1974).

ation with the IRS and his employment with the State, plaintiff considered his information particularly valuable. As a condition of providing the information, SP–59 insisted on strict confidentiality. Plaintiff testified the reason for this insistence was that, because of a "personality conflict," SP–59 did not want certain people in the Springfield District office to know he was providing confidential information and that he thought he might lose his job with the State should this come to light. SP–59 did in fact lose his job after this incident. SP–59 further stated that plaintiff would have to take SP–59 and both their wives out to dinner to avoid any possibility that someone might suspect that they were discussing confidential tax information. It became plaintiff's practice to contact SP–59 only when the information supplied was incomplete or needed clarification; normally, SP–59 would call plaintiff when he had information to impart.

The two couples went to dinner on four occasions in late 1973 and early 1974, and, although no tax matters were discussed during the dinners because their wives were present, after dinner, at SP–59's home, plaintiff obtained considerable and useful tax-related information. After each such meeting plaintiff submitted an "Imprest Fund Reimbursement Voucher" and "Memorandum of Activities" to his group supervisor, Gerald Schaefer.[3] After Schaefer signed the voucher, it was submitted to the appropriate accounting office, and plaintiff was reimbursed for the expenses incurred.

In April 1975 the Inspection Division of the IRS initiated an audit of the Imprest Fund Account, undertaken at the request of the Commissioner of Internal Revenue, to review the expenditures for informants. The IRS specifically wanted to know the true names of those people designated as

confidential informants in order to verify their existence.

Schaefer, then Acting Assistant Chief, directed Robert Brady, a special agent serving as acting group supervisor, to prepare a list setting forth the informant number, the special agent to whom the number was assigned, and the informant's real name. After assuring himself of his authority to require the agents to disclose an informant's true identity, Brady called each agent in the group into the group supervisor's office. He explained the purpose of the order to reveal the names and showed each agent a photocopy of the manual where he had highlighted the portions relating to the disclosure of a confidential informant's identity. He then requested the agent to open the envelopes and read the names on the slips inside, which names he then recorded on the list for the Inspection Division. At least one special agent told him at the time the envelope was opened that the name inside was fictitious and volunteered to attempt to obtain the true name. Brady followed the same procedure with plaintiff and asked him if plaintiff had any objections to disclosing his informants' identities, to which plaintiff replied that he did not. "Bud Hoskins" was the name on the slip of paper in the envelope marked "SP–59." Brady did not ask plaintiff the specific question whether "Bud Hoskins" was SP–59's real name, nor did plaintiff volunteer the information that "Bud Hoskins" was an alias, although he understood that the identity of informants was needed because of the audit.

Sometime during the week of May 12, 1975, Schaefer himself contacted plaintiff in order to obtain a "better first name" for Hoskins, since Inspection had been unable to locate him through tax returns or tele-

**3.** A June 9, 1972, memorandum to all group supervisors and special agents, Springfield District, from the Chief, Intelligence Division, described Imprest Fund procedures as follows:

"* * * These funds are to be used solely for confidential expenses in connection with the procurement of evidence or information pursuant to enforcement of the laws and regulations governing the operations of our activity.

This encompasses any use to which such funds might be put in the course of an official investigation (IRM 9773.3). Imprest funds are not to be used for an employee's own private purposes. However, this is not to be interpreted as precluding the use of funds to pay for food, drink, etc. when deemed necessary in view of the nature of the investigative assignment."

phone directories. Although there is a conflict as to what was actually said, plaintiff clearly knew that Schaefer was trying to identify SP–59; he knew SP–59's true identity; and he did not tell Schaefer SP–59's true name. Sometime later, Schaefer asked plaintiff if he had any further information. Plaintiff replied that the informant normally called him, not the other way around.

Shortly after his conversations with Schaefer, plaintiff did in fact initiate a contact with SP–59 and told him that Inspection was auditing the Imprest Fund Account and was "putting pressure" on plaintiff to reveal SP–59's true name. SP–59 agreed to supply the information to the IRS District Director through a different channel. On or about May 23, 1975, the District Director received a call from the Director of the Illinois Department of Revenue, who said an employee of his had stated he had been a confidential informant for an agent of the Springfield District, using the assumed name of "Bud Hoskins." The removal proceedings against plaintiff followed.

### I.

Plaintiff first attacks the FEAA decision on the ground that the sustained charges were not supported by substantial evidence.

---

4. *Nibali v. United States,* 589 F.2d 514, 516, 218 Ct.Cl. ——, —— (1978).

5. *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). *See Wathen v. United States,* 527 F.2d 1191, 1197, 208 Ct.Cl. 342, 351 (1975), *cert. denied,* 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976); *Koppers Co. v. United States,* 405 F.2d 554, 559, 186 Ct.Cl. 142, 149 (1968).

6. Reason II of the December 4, 1975, notice of proposed adverse action, reads as follows:
 "REASON II. You failed to comply with Internal Revenue Service Regulations, Section 9373.1, which reads in part:
 " '9373.1
 " 'Informants
 " '(4) Every effort should be made to determine the informant's true identity and address. It is not essential, however, that the informant sign his true name to a receipt. His identity will be kept confidential, and will not be disclosed to unauthorized persons. When deemed essential to protect the identity of an informant, or when the Government's interest will be served, the informant may use an assumed

We begin, of course, in full understanding of our limited role. Although an administrative determination not supported by substantial evidence cannot stand,[4] this court will not overturn an agency decision if it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] Thus, although we might disagree with the ultimate conclusion as to the preponderance of the evidence, mere disagreement will not entitle us to overturn a contrary conclusion which is based on substantial evidence of record.

### A. *Reason II*

Reason II, supported by a single specification,[6] charged that plaintiff had failed to comply with "Internal Revenue Regulation" section 9373.1, in that he had failed to record SP–59's true name in the pink envelope. The FEAA sustained the charge on the ground that the agency had discretion to implement the regulation through the envelope system, that the envelope system required the use of true names, and that plaintiff had indeed failed to use the true name of SP–59. Plaintiff argues that the specification does not support the charge,

name, provided, however, his true name and address, if known, are recorded in a file of a confidential nature in the district office for association with his assumed name. If the actual name cannot be used, a numerical identification system may be employed (except on a claim for reward), such as "Confidential Informant No.," with the number prefixed by the symbol of the district office.'
 "*Specification.* On or about May 1, 1975, you opened an envelope which under the existing system utilized by the Springfield District should have contained the true identity of the confidential informant, if known. In the presence of your Acting Group Supervisor, Mr. Robert Brady, you opened the envelope, checked the contents, and handed the contents to Brady. Upon the slip of paper contained in the envelope was written the name 'Bud Hoskins.' Investigation has shown that Bud Hoskins is a fictitious name and that you were, at all times, aware of the actual identity of the informant referred to in the envelope. This informant, Bud Hoskins, was also identified by the identification number SP 59."

and that, since the regulation does not *by its terms* require use of an envelope system, the variance between the charge and specification renders the charge procedurally defective.

While we adhere to the general principle that "[d]eviations between an agency's putative charges for proposed adverse personnel actions and the grounds advanced by a hearing examiner as supportive of the adverse personnel action, are not to be cavalierly tolerated,"[7] and agree with plaintiff's assertion that sustaining this charge hinges on "equating" the envelope system with the system created by IRM § 7373.1(4), we also agree with the FEAA that the regulation *permits* the local management to establish the envelope filing system. Whether plaintiff is correct that the regulation *permits* the establishment of two separate filing systems—one in which the name of the informant may be privately recorded, and the other where it need not be—it is clear that the agency interpretation is at least as plausible and that the envelope system was established in the Springfield District to implement the requirement of the regulation that "the informant may *use* an assumed name, *provided, however, his true name and address, if known, are recorded in a file of a confidential nature in the district office for association with his assumed name.*" (Emphasis added.) Moreover, there is substantial testimony that aliases were not acceptable. We therefore hold that the FEAA decision sustaining Reason II is supported by substantial evidence.

### B. *Reason III*

The more serious charge states that plaintiff made intentionally false statements on matters of official interest, in violation of "IRM 0735.1, Section 225.5, Handbook of Employee Responsibilities and Conduct."[8] Although Reason III actually reads, "You Made False Statements," the supporting regulation speaks of *intentionally* false or misleading statements, and we shall treat the case on this basis.[9] The charge as sustained contains four specifications.

*Specification 1.*

Following each of the dinners attended by plaintiff, SP–59, and their wives, plaintiff submitted vouchers to his group supervisor requesting reimbursement from the Imprest Fund Account. Each voucher contained the language, "I certify that the funds shown after 'confidential expenditures' were paid by me in connection with the Imprest Fund Account above and that the details of these expenditures have been furnished to Group Supervisor Schaefer." Plaintiff did not note on the voucher, nor otherwise communicate to his group supervisor, the fact that plaintiff's wife had accompanied him. In sustaining the charge in

---

7. *Razik v. United States*, 525 F.2d 1028, 1033–34, 208 Ct.Cl. 265, 275 (1975).

8. Reason III of the notice of proposed adverse action contains the following:
 " '225.5
 " 'False Statements
 " 'Proper functioning of the Revenue Service requires that the Service, the courts, other Federal agencies and the public be able to rely implicitly on the truthfulness of Revenue Service employees in matters of official interest. An employee may be subjected to severe disciplinary action and prosecution for intentionally making false or misleading verbal or written statements in matters of official interest. Some of these matters of official interest are: transactions with taxpayers, other Federal agencies or fellow employees; entries on tax returns, work reports of any nature or accounts of any kind; vouchers, leave requests, applica-

tion forms, and other forms which serve as a basis for appointment, reassignment, promotion, or personnel actions; and affidavits, transcripts of testimony, or statements to Inspection, whether or not under oath.' "

9. "If * * * the executive branch wishes to punish its * * * employees for false statements made without guilty intent, at least, that purpose should be put up to them squarely in the notice of proposed removal. Such a Draconian rule may raise constitutional issues under some circumstances." *Urbina v. United States*, 180 Ct.Cl. 194, 219 (1967); *cf. Hoover v. United States*, 513 F.2d 603, 206 Ct.Cl. 640 (1975) (court satisfied that, although notice did not specifically charge anything more than mistake, case actually pursued throughout on theory that plaintiff could not be separated unless actions proved deliberate).

regard to this specification, the FEAA stated:

> Every witness that testified concerning this question, including those called by [plaintiff], stated that it was extremely unusual for an agent to have his wife accompany · him on an investigation. While there was disagreement as to whether or not advance approval must be obtained where only small amounts of money were expected to be involved and the agent was using his own funds, there was virtually no disagreement that a wife's presence in such a situation should be mentioned when seeking reimbursement. [Plaintiff] must have full well realized that this was not an ordinary expense and, therefore, not one that was so normal and routine that it need not be mentioned when seeking reimbursement.
> * * *

We note first that the FEAA dismissed Reason I, relating to plaintiff's failure to obtain advance approval for expenditure of these funds (for which he would seek reimbursement), since advance approval was essentially a matter of judgment. Here, there is no specific internal requirement or regulation that an agent mention his spouse's presence; this, too, was a "judgment call." Even if it were "clearly unusual" for a wife to accompany her husband on an investigation, the charge is making an *intentionally false* statement, not simply failing to comply with an internal procedure, as in Reason II. If the evidence is not clear and convincing that plaintiff knew he should have mentioned his wife's presence

at the dinners, the specification cannot stand.

There is no evidence (other than the "clearly unusual" circumstances alluded to above) that there existed any requirement that a special agent do anything more than submit the voucher and a memorandum of activities. The vouchers themselves do not provide for breakdowns of expenses, but simply state that details in fact were furnished. The supervisor must certify on the voucher that details were furnished to him, yet it is undisputed that Schaefer did not ask plaintiff for anything more than what was submitted. Schaefer knew that the money had been spent for the purpose of obtaining admittedly valuable information from a confidential informant, and the agency does not dispute the property either of the amounts (which ranged from $31.15 to $38.20) or of plaintiff's judgment that taking the spouses along would lend an air of respectability and anonymity which would help disguise the purpose of the meetings. We hold, therefore, that the fact that it was unusual for an agent's spouse to go along on an investigation is not substantial enough to support a finding that plaintiff clearly must have known he should mention that fact to his supervisor when seeking reimbursement. The most that can be said, on the present record, is that plaintiff labored under a misunderstanding as to what was being asked of him. It cannot be said that he was aware that he was required to provide the information concerning his wife's presence; his failure to do so was not intentional.[10]

---

10. *Cf. Pascal v. United States*, 543 F.2d 1284, 211 Ct.Cl. 183 (1976). In *Pascal*, an IRS Audit Division employee was removed on charges relating to an official trip (deliberate falsification of time records and failure to obtain advance authorization for absence from duty post). The chief dispute concerned the administrative finding that plaintiff knew his reports were false and knew he should have obtained advance authorization to take time off. The Commission was not persuaded that plaintiff misunderstood his travel status rights. The court agreed, stating:

> " * * * It follows that, with plaintiff's testimony thus discounted, there was more than

substantial evidence to sustain the * * * charges * * *.

" * * * Much is left to the common understanding that work-time is for work and those activities directly related to work—not for personal recreation or personal concerns. * * * '[it is] beyond belief that an employee with [plaintiff's experience] would believe that he could travel for his own personnal [sic] pleasure on government time.' " 543 F.2d at 1287–88, 211 Ct.Cl. at 188–89 (footnote omitted).

By contrast, this is *not* a case where the credibility issue was resolved against plaintiff, nor is it "beyond belief" that plaintiff should not have known of the putative requirement,

*Specification 4.*

 A second allegation of intentional false statement reads:

On June 3, 1975, when being interviewed under oath by Inspector Kenneth W. Davidson, you stated that you were told by your former Group Supervisor, Thomas Murphy, that fictitious names were acceptable in the envelope file system for the use of confidential informants. Mr. Murphy stated that he did tell you that fictitious names were acceptable for the receipt of monies paid to informants but that the envelopes used for their identify [*sic*] had to contain the true identity of the informants, if known.

The FEAA dismissed the second part of specification 4, finding that there was no support for Murphy's statement that he had told plaintiff the envelopes had to contain the true identity of informants, if known. On the other hand, it upheld the first part because no one corroborated plaintiff's statement that Murphy had said fictitious names were acceptable. Without some proof, however, that plaintiff's statement under oath was something more than mistaken, the specification must fail.

Again, the charge is making an *intentionally* false statement. It is one thing to find plaintiff failed to comply with the requirement that true names, if known, be used; it is quite another to find that stating he thought fictitious names were acceptable

was intentionally false.[11] Even assuming plaintiff did not prove that Murphy actually said aliases were acceptable, plaintiff's mistaken impression falls short of an intentionally false statement. Plaintiff need not have been told fictitious names were acceptable to be under the impression that they were. Murphy had, in fact, stated that aliases were acceptable under some circumstances, namely, for the receipt of monies paid to informants. If two persons have an oral conversation and differ afterwards as to what was said, it does not necessarily follow that one or the other must be lying.[12] We find that specification 4 is not supported by substantial evidence.

*Specifications 2 and 3.*

We turn now to the most serious of the specifications under Reason III. These state in essence that plaintiff deliberately misled his supervisor on two separate occasions as to whether he knew SP–59's (or Bud Hoskins') true name.[13]

Although there was a dispute between plaintiff and his supervisor as to exactly what was said on the first occasion, the FEAA thought it unnecessary to resolve that question since the specification did not purport to quote plaintiff's exact words; instead, it ruled that "[t]he agency need only show that [plaintiff's] words and actions were reasonably calculated to lead Mr. Schaefer to believe that [plaintiff] did not know Hoskins' first name. [Plaintiff's]

which cannot be said to be a matter of "common understanding."

11. The examiner must have overlooked the testimony of James Willis that he believed it to be acceptable to place a confidential informant's assumed name in the envelope if the situation dictated and that any knowledge he obtained in this regard would have been through group meetings. Compare plaintiff's testimony that Mr. Murphy "told *us* it was acceptable" (emphasis added) and that he believed Murphy said this at a group meeting.

12. *Swaaley v. United States*, 376 F.2d 857, 861, 180 Ct.Cl. 1, 8 (1967).

13. Specifications 2 and 3 of Reason III read as follows:

"*Specification 2.* On May 14, 1975, when asked by Acting Assistant Chief, Intelligence Division, Mr. Gerald Schaefer, to furnish a bet-

ter name for SP 59, who you had identified as Bud Hoskins, you informed him that you did not know Hoskins' first name, but that you would try to get the information for him. Investigation has disclosed that Bud Hoskins is a former special agent with whom you had worked and have known personally for fourteen years.

"*Specification 3.* On May 16, 1975, Mr. Schaefer again asked if you had any additional information on Hoskins. You told him, 'No, I have not[.] He has not called me yet.' When asked what that meant, you stated, 'He calls me when he has information. I do not call him.' Investigation has disclosed that Bud Hoskins is a former special agent with whom you had worked and have known personally for fourteen years."

words did exactly that. Mr. Schaefer asked for a better name and [plaintiff] knew why the question was being asked."

Although the parties essentially agree that plaintiff said what is attributed to him on the second occasion in specification 3, plaintiff argues that the statement is true on its face, or at least not inconsistent with an accurate description of plaintiff's and SP–59's working relationship. The FEAA upheld the specification "[b]ased on [plaintiff's] admission that he could, and in fact did contact SP–59, and the undisputed fact that [plaintiff] did know 'additional information on Hoskins' which he did not disclose at that time, nor give any explanation at that time for his refusal to disclose."

Plaintiff takes the position, however, that a statement—even though creating a false impression—which is true on its face should not be the basis for a dismissal; that, to be sufficient, a false statement must be affirmatively false, not merely false by negative inference. Thus, says plaintiff, he would have to have said flatly that he did not know the informant's first name in order to have made a false statement. Plaintiff, relying primarily on *United States v. Clifford*, 426 F.Supp. 696 (E.D.N.Y.1976), then says the case law on criminally false statements requires that falsity be proven by the "actual content of the statement itself," not by inferences or conclusions drawn from a statement, and urges the court to adopt the same standard for federal employee dismissals on charges of making intentionally false statements.

■ Initially, we must reject plaintiff's position that this court should adopt the standards applicable in prosecutions for criminally false statements or perjury. The employment relationship should be neither adversary nor hostile, and we decline to make it so by applying such an exacting standard.[14] Superiors should be able to rely on the *implicit* trustworthiness of an employee's statements.

■ We are not insensitive, however, to the ignominy attached to a dismissal based on the making of intentionally false statements. While it may be that a discharge proceeding is not to be equated in all respects with a criminal proceeding, nevertheless, when a Government employee's job, and possibly his entire future, is at stake, the proof of his making an intentionally false or misleading statement should certainly be at least clear and convincing. *Urbina v. United States*, 180 Ct.Cl. 194, 214 (1967).[15]

■ While we are sympathetic with plaintiff's dilemma—honoring his promise of confidentiality to his informant under the peculiar circumstances *versus* complying with a superior's authorized request—there is no doubt from the record that plaintiff intentionally and deliberately misled his superior into believing that "Bud Hoskins" was SP–59's true name and that plaintiff could not ascertain a "better first name" until SP–59 called him. The evidence shows that plaintiff, shortly after his conversations with his supervisor, placed a call to the informant, told him Inspection was conducting an audit within the division and wanted to know the names of the informants, and that plaintiff asked SP–59 if he could divulge his name. Furthermore, in his affidavit of June 3, 1975, plaintiff stated, "When I was questioned by Schaefer, I

---

14. Cf. *Strothers v. United States*, Ct.Cl. No. 348–78 (order, Apr. 20, 1979) (rejecting criminal standard of proof).

15. *Compare Power v. United States*, 209 Ct.Cl. 126, 531 F.2d 505 (1976) (although "guilt" supported by substantial evidence, substantial doubt that false claims submitted knowingly, intentionally, and with purpose to defraud) with *Rifkin v. United States*, 209 Ct.Cl. 566 (1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 545 (1977) (deliberate misrepresentation, insufficient evidence of misunderstanding; psychological motivation irrelevant); *Hoover v. United States*, 513 F.2d 603, 206 Ct.Cl. 640 (1975) (actual knowledge or gross recklessness; IRS tax technician); *Birnholz v. United States*, 199 Ct.Cl. 532 (1972) (IRS attorney-accountant; no plausible explanation for misrepresentation such as there was in *Urbina*); and *Liotta v. United States*, 174 Ct.Cl. 91 (1966) (flagrant, knowing, and repeated violations of rules and regulations re-accepting compensation from taxpayers for services connected with preparation of tax returns).

understood he was trying to identify SP59." Plaintiff, in an attempt to resolve his dilemma, which was of his own making, was apparently trying to "buy time." His fatal error is that he was not initially straightforward with his superior; he did not, when questioned either by Brady or Schaefer, ask for the chance to work it out first with his informant. Certainly by the time the third inquiry was made it should have been clear to plaintiff that he had an obligation to speak. His failure to do so can only be interpreted as intentional on his part.

Plaintiff's informant was not an unsophisticated person in terms of knowledge of the workings of the Intelligence Division. Both plaintiff and his informant must have recognized that the supervisor could not have confidence in an agent's professional conduct in investigations of taxpayers if the supervisor were unable to rely on the rectitude of the agent in their own discussions. The Internal Revenue Service sets a high priority on straightforward conduct, not only on the part of taxpayers, but by its employees as well. It is especially important that this standard be maintained in that part of the Revenue Service which conducts examinations which may lead to a taxpayer's punishment for criminal acts. Any lesser standard will lead to a lack of public confidence in the Revenue Service and make its difficult task an impossible one.

When asked on May 16, 1975, if he had any additional information on Hoskins, plaintiff stated that he did not. This statement clearly misled Schaefer into believing that plaintiff did not at that time know the additional facts necessary for completion of the list which had been fully described to plaintiff. Plaintiff, in fact, had this additional information all along, and his statement that he did not was, in these circumstances, false and misleading. As we have noted above, for Schaefer to have "pinned down" plaintiff, as in a prosecution for perjury,[16] would have injected an inappropriate atmosphere of hostility into their relationship. It was plaintiff's obligation at this point, if not earlier, to give Schaefer a straightforward response that either provided the information which plaintiff knew Schaefer wanted, or to explain his dilemma to Schaefer.

We have noted before that plaintiff does not contest the exact words he is alleged in specification 3 to have used. Plaintiff knew the sense in which Schaefer asked whether he had any additional information on Bud Hoskins; he nevertheless gave an answer which he knew to be false to the question as thus put in the sense thus intended. While his reply—"No, I haven't. He hasn't called me yet. He calls me when he has information. I don't call him."—is accurate in one sense, it is intentionally misleading as an answer to a question the purport of which plaintiff fully comprehended.

We therefore hold that there is substantial evidence to support the decision of the FEAA upholding specifications 2 and 3 of Reason III.

## II.

We turn to plaintiff's final contention that the penalty of dismissal is so harsh in relation to the charges as to constitute an abuse of discretion.[17] Plaintiff relies on cases holding that lack of intent is the primary factor to be considered when deciding whether a discharge should be reversed, and he argues dismissal is too harsh in this case because his misstatements were not intentional. Loss of a job may be "unduly harsh punishment for a [mere] good faith error,"[18] but, as in *Culver*, plaintiff's misstatements were not made in good faith. This element of intent or willfulness sets this case apart from *Boyce v. United States*, 543 F.2d 1290, 211 Ct.Cl. 57 (1976), *Power v.*

---

**16.** See *Bronston v. United States*, 409 U.S. 352, 360, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

**17.** We reject at the outset defendant's argument that this court has no jurisdiction to review the sanction imposed by an agency beyond its compliance with procedural requirements. See *Power v. United States*, 531 F.2d 505, 209 Ct.Cl. 126 (1976).

**18.** *Culver v. United States*, Ct.Cl. No. 395–77 (order, Jan. 5, 1979).

*United States*, 531 F.2d 505, 209 Ct.Cl. 126 (1976), and *Urbina v. United States*, 180 Ct.Cl. 194 (1967), and makes it more akin to *Giles v. United States*, 553 F.2d 647, 213 Ct.Cl. 602 (1977), *Rifkin v. United States*, 209 Ct.Cl. 566 (1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 545 (1977), *Hoover v. United States*, 513 F.2d 603, 206 Ct.Cl. 640 (1975), and *Birnholz v. United States*, 199 Ct.Cl. 532 (1972).

In reaching our conclusion, we have not been unmindful of plaintiff's long and previously unmarred record in the Revenue Service; yet, this, in itself, imputes to him knowledge of the high standard expected of him. Since we have found the most serious charges of intentionally false or misleading statements supported by substantial evidence, we hold that the penalty of dismissal was within the agency's discretion and did not constitute an abuse thereof.

Plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted; and the petition is dismissed.